**RAILROAD COMMISSION OF TEXAS**
and the Atlantic Refining Company,
Appellants,

v.

**PERMIAN BASIN PIPELINE COMPANY,**
Appellee.

**RAILROAD COMMISSION OF TEXAS**
and the Atlantic Refining Company,
Appellants,

v.

**PHILLIPS PETROLEUM COMPANY,**
Appellee.

Nos. 10495, 10496.

Court of Civil Appeals of Texas.

Austin.

April 17, 1957.

Rehearing Denied May 8, 1957.

Will Wilson, Atty. Gen., James N. Ludlum, First Asst. Atty. Gen., Black & Stayton, Austin, for appellants.

Lawrence I. Shaw, F. Vinson Roach, Jack C. Osborne, Omaha, Neb., Looney, Clark & Moorhead, Austin, for Permian Basin Pipeline Co.

Rayburn L. Foster, Harry D. Turner, Bartlesville, Okl., E. H. Foster, Boyd D. Taylor, C. J. Roberts, Amarillo, for Phillips Petroleum Co.

ARCHER, Chief Justice.

These two cases, although not consolidated for trial, were tried together, have a common record, and involve some common questions of law and of fact, but each case presents some questions of law and fact peculiarly affecting each separate case.

We shall endeavor to determine the questions as presented in each case in one opinion, with such explanations as may appear essential for an understanding of the issues raised by all parties.

The appeal is from final judgments of the court granting both temporary and permanent injunctions.

The judgment in the Permian case, in part, is:

"The Court heard and considered the pleadings, the evidence and the argument of counsel in this action brought by Plaintiff Permian Basin Pipeline Company against the Railroad Commission of Texas, including the intervention therein of The Atlantic Refining Company and the cross-action filed by the Intervenor, The Atlantic Refining Company, against the Defendant the Railroad Commission of Texas, and is of the opinion (1) that the law and the facts are with the Plaintiff Permian Basin Pipeline Company, and it is entitled to recover judgment against the defendant Railroad Commission of Texas as hereinafter decreed; (2) that the law and the facts are with the Defendant Railroad Commission of Texas in the cross-action filed against it by the Intervenor, The Atlantic Refining Company, and that the Railroad Commission of Texas is entitled to judgment denying the Intervenor, The Atlantic Refining Company, any relief prayed for in its cross-action against the Defendant Railroad Commission of Texas, as hereinafter decreed; (3) that the Order of the Railroad Commission of Texas No. 8–34,-332 dated November 1, 1956, and its Supplemental Order No. 8–34,421 dated November 15, 1956, are void, illegal and unauthorized by law; (4) that the enforcement of such void, illegal and unauthorized orders against the Plaintiff Permian Basin Pipeline Company would inflict irreparable injury and damage upon said Plaintiff, for which it would have no adequate remedy at law; and therefore that the Defendant Railroad Commission of Texas, together with the members thereof, and their agents, servants, and employees should be permanently enjoined from enforcing said orders; and (5) that the status quo in this case was the status existing immediately prior to the issuance of said two orders; that it is highly probable that said status quo will be disturbed if the enforcement of said orders is not temporarily enjoined pending the final outcome of any appeal herein; that by virtue of such fact and by virtue of the Court's conclusion that said orders are void,

illegal and unauthorized, their enforcement should be so temporarily enjoined pending appeal; and that the bonds on file in support of the temporary restraining order are sufficient to protect the Defendants and the Intervenor from injury during the pendency of any appeal.

"Therefore, on the 7th day of January, 1957, it was Ordered, Adjudged and Decreed by the Court as follows:

"(1) That the Plaintiff Permian Basin Pipeline Company have judgment against the Defendant Railroad Commission of Texas, composed of W. J. Murray, Jr., Ernest O. Thompson and Olin Culberson, setting aside and holding for naught the Order of the Railroad Commission of Texas No. 8–34,332 dated November 1, 1956, and its Supplemental Order No. 8–34,421 dated November 15, 1956;

"(2) That the Plaintiff Permian Basin Pipeline Company have judgment against the Defendant Railroad Commission of Texas, composed of W. J. Murray, Jr., Ernest O. Thompson and Olin Culberson, permanently enjoining said Defendants, their agents, servants and employees from enforcing the aforesaid orders of the Railroad Commission of Texas, and further permanently enjoining said Defendants from in any way penalizing Plaintiff Permian Basin Pipeline Company, or inflicting any sanctions upon it for its failure to obey said orders; * * *"

The judgment in the Phillips case, in part, is:

"The Court heard and considered the pleadings, the evidence and the argument of counsel in this action brought by Plaintiff, Phillips Petroleum Company, against the Railroad Commission of Texas, including the intervention therein of The Atlantic Refining Company and the cross action filed by the Intervenor, The Atlantic Refining Company, against the Defendant, Railroad Commission of Texas; and the Court is of the opinion (1) that the law and the facts are with the Plaintiff, Phillips Petroleum Company, and it is entitled to recover judgment against the Defendant, Railroad Commission of Texas, as hereinafter decreed, and (2) that the law and the facts are with the Defendant, Railroad Commission of Texas, in the cross action filed against it by the Intervener, The Atlantic Refining Company, and that the Railroad Commission of Texas is entitled to judgment denying the Intervener, The Atlantic Refining Company, any relief prayed for in its cross action as hereinafter decreed.

"It Is Therefore, on this 7th day of January, 1957, Ordered, Adjudged and Decreed (1) that the Orders of the Railroad Commission of Texas Nos. 8–34,332 and 8–34,421 of November 1 and November 15, 1956, respectively pertaining to the Puckett-Ellenburger reservoir in Pecos County, Texas, be set aside, and they are hereby set aside and held for naught, (2) that the Intervener, The Atlantic Refining Company, be, and it is hereby denied any recovery on its cross action against the Defendant, Railroad Commission of Texas, and (3) that the Plaintiff, Phillips Petroleum Company, have judgment against the Defendant, Railroad Commission of Texas, composed of Chairman Wm. J. Murray, Jr., and Commissioners Olin Culberson and Ernest O. Thompson, permanently enjoining said Defendant, its agents, servants and employees, from enforcing in any way the aforesaid orders."

The orders complained of are as follows:

RAILROAD COMMISSION OF TEXAS
OIL AND GAS DIVISION

OIL AND GAS DOCKET NO. 126     IN RE: CONSERVATION AND PREVENTION OF
#8 - 30.54                 WASTE OF CRUDE PETROLEUM AND
                                NATURAL GAS IN THE PUCKETT-
                                ELLENBURGER FIELD, PECOS COUNTY,
                                TEXAS

Austin, Texas
November 1, 1954

SPECIAL ORDER
ADOPTING RULES AND REGULATIONS FOR THE PUCKETT-ELLENBURGER FIELD
PECOS COUNTY, TEXAS

WHEREAS, After due notice, the Railroad Commission of Texas held a hearing on September 22, 1954, on the application of Phillips Petroleum Company to consider the adoption of rules and regulations to govern the drilling, completion and operation of wells in the Puckett-Ellenburger Field, Pecos County, Texas; and

WHEREAS, From evidence adduced at said hearing, the Commission finds that the subject field was discovered in July, 1952, and is currently developed with eight wells producing from the Ellenburger formation encountered at an approximate depth of 13,500 feet; that the average gross thickness of the reservoir is approximately 1500 feet; that the gas-water contact was established at approximately 13,500 feet; that there is a uniformity of pressure throughout the reservoir; that one well will adequately drain 640 acres; and

WHEREAS, From evidence submitted at said hearing, the Commission is of the opinion and finds that waste as the term is defined in the applicable statutes will take place in said field unless rules are adopted by the Commission to prevent such waste and to provide for a more orderly development and operation of said field.

NOW, THEREFORE, IT IS ORDERED by the Railroad Commission of Texas that effective October 11, 1954, the following rules in addition to such of the Commission's general rules and regulations as are not in conflict herewith, be and the same are hereby adopted to govern the drilling, completion and operation of wells in the Puckett-Ellenburger Field, Pecos County, Texas.

RULE 1: No gas well shall hereafter be drilled nearer than thirteen hundred twenty (1320) feet to any well completed in or drilling to the same reservoir on the same lease, unitized tract or farm, and no well shall be drilled nearer than six hundred sixty (660) feet to any property line, lease line or subdivision line; provided, however, that the Commission will, in order to prevent waste or to prevent the confiscation of property grant exceptions to permit drilling within shorter distances than herein prescribed whenever the Commission shall have determined that such exceptions are necessary either to prevent waste or to prevent the confiscation of property. When exception to this rule is desired, application therefore shall be filed and shall be acted upon in accordance with the provisions of Commission Statewide Rules 37 and 38, which applicable provisions of said rules are incorporated herein by reference.

The aforementioned distances in the above rule are minimum distances to allow an operator flexibility in locating a well, and the above spacing rule and the other rules to follow are for the purpose of permitting only one well to each proration unit.

In applying this rule the general order of the Commission with relation to the subdivision of property shall be observed.

RULE 2: The casing program of all wells hereafter drilled in said field shall include at least three (3) strings of pipe set in accordance with the following program:

(a) A minimum of nine hundred (900) feet of new or reconditioned surface casing with an original mill test of not less than one thousand (1000) pounds per square inch shall be set and cemented. Cement shall be by the pump

---

OIL AND GAS DOCKET NO. 126
#8 - 30.54
-2-

and plug method, and sufficient cement shall be used to fill the annular space back of the pipe to the surface of the ground or the bottom of the cellar. Cement shall be allowed to stand a minimum of twelve (12) hours under pressure and be tested by pump pressure of at least one thousand (1000) pounds per square inch applied at the well head. If at the end of thirty (30) minutes the pressure shows a drop of one hundred (100) pounds per square inch, or more, the casing shall again be tested in the same manner.

(b) An intermediate string of casing consisting of a minimum of five thousand (5000) feet of new or reconditioned pipe that has been tested to two thousand (2000) pounds per square inch, shall be run. Sufficient cement shall be used to fill the calculated annular space back of the pipe to at least as high as the bottom of the surface pipe. Cement shall be by the pump and plug method, and the cement shall be allowed to stand a minimum of twelve (12) hours before initiating tests or drilling the plug. The casing shall be tested by pump pressure of at least twelve hundred (1200) pounds per square inch applied at the well head. If at the end of thirty (30) minutes the pressure shows a drop of one hundred twenty (120) pounds per square inch, or more, the casing shall be condemned. After the corrective operations, the casing shall again be tested in the same manner.

(c) The producing or oil string shall be new or reconditioned pipe that has been tested to three thousand (3000) pounds per square inch, and shall be set no higher than the top of the producing formation. Cement shall be used to fill the calculated annular space behind the pipe to at least as high as the bottom of the intermediate string of casing. Cement shall be allowed to stand a minimum of twelve (12) hours under pressure and a total of twenty-four (24) hours before drilling the plug. The casing shall be tested by pump pressure of at least fifteen hundred (1500) pounds per square inch applied at the well head. If at the end of thirty (30) minutes the pressure shows a drop of one hundred fifty (150) pounds per square inch, or more, the casing shall be condemned. After the corrective operations, the casing shall be tested in the same manner.

RULE 3: The acreage assigned an individual non-associated gas well for the purpose of allocating allowable gas production thereto shall be known as a gas proration unit, which such acreage may be produced for each non-associated gas reservoir independently of any other reservoir. No gas proration unit shall contain more than six hundred forty (640) acres except as hereinafter provided; and no acreage shall be included in any proration unit formed or created subsequent to the effective date of this order and allocated to the well thereon unless the most distant boundary of such acreage down to be included in such unit is within sixty-five hundred fifty (6550) feet of such well; provided that tolerance acreage of ten (10) percent shall be allowed for each unit so that an amount not to exceed a maximum of seven hundred four (704) acres may be assigned. Such continuous tolerance acreage shall be listed as fractional proration unit. All such proration units shall consist of continuous and contiguous acreage which can reasonably be considered to be productive of gas.

---

OIL AND GAS DOCKET NO. 126
#8 - 30.54
-4-

RULE 4: (a) The daily allowable production of gas from individual gas wells completed in the Puckett-Ellenburger Gas Field, as herein defined, shall, after deductions have been made for those wells incapable of producing their allowables as determined hereby, be determined by distributing the remaining total field daily allowable production among the remaining wells in the field in the ratio that the product of the gross acre feet assigned to the well for allocation purposes and the reservoir pressure of the well bears to the summation of this product with respect to all other such gas wells in the field.

Operators shall file with the Commission certified plate of their properties in said field, which plate shall set out distinctly all of those things pertinent to the determination of the acreage credit claimed for each well; provided that if the acreage assigned to any proration unit has been pooled, the operator shall furnish the Commission with such plats as it may require as evidence that interests in said proration unit have been so pooled.

---

OIL AND GAS DOCKET NO. 126
#8 - 30.54
-3-

(b) Gross acre feet as used herein shall be the total gross acre feet of Ellenburger formation considered originally productive of gas underlying the acreage assigned to the gas well for allocation purposes.

(c) Reservoir pressure as used herein shall be the absolute pressure obtained at, or calculated to, the following depth: datum depth equal depth to the top of Ellenburger formation in the well bore plus one-half (1/2) of the quotient obtained by dividing the gross acre feet of formation assigned to the well by the productive acreage assigned to the well.

RULE 5: (a) The reservoir pressure of each well in the Puckett-Ellenburger field shall be determined not later than fifteen (15) days after the start of production for one or more of the legal purposes as set out in Article 6008, Section 7, Revised Civil Statutes of Texas, and shall be filed in duplicate with the Commission within ten (10) days after completion of such test. The effective date of the reservoir pressure for allowable purposes shall be the date of first gas production provided the test is taken and reported in accordance with the above time requirements, otherwise the effective date shall be advanced one day for each date the test is late.

(b) Annually, during the month of July, the reservoir pressure of each well shall be determined and filed in duplicate with the Commission within ten (10) days after completion of such test. The effective date of the annual reservoir pressure for allowable purposes shall be October first of each year or the date the test is received by the Commission, whichever is the later.

IT IS FURTHER ORDERED that this cause be held open on the docket for such other and further orders as may be necessary.

RAILROAD COMMISSION OF TEXAS

Chairman

Commissioner

Commissioner

ATTEST:

Secretary

CAB:ss

Railroad Commission of Texas
Oil and Gas Division

Oil and Gas Docket No. 126
No. 8 – 34,332

In re: Conservation and Prevention of Waste of Crude Petroleum and Natural Gas in the Puckett (Ellenburger) Field, Pecos County, Texas
Austin, Texas
November 1, 1956

Special Order

Amending Rules of Puckett (Ellenburger) Field, Pecos County, Texas, by Addition of Rule 6 to Provide for Determination of Ratable Allocation of Production, Suspending the Operation of the Balancing Rule for Said Field, Providing Adjustment for Current Accrued Overproduction and Underproduction, Declaring Permian Basin Pipe Line Company to be a Common Purchaser of Gas from All Wells in the Puckett (Ellenburger) Field, and Ordering Said Common Purchaser to Take Ratably from All Connections.

Whereas, the Railroad Commission of Texas, after due notice and hearing by Special Order No. 8–30,514, issued effective October 11, 1954, promulgated and adopted field rules for the Puckett (Ellenburger) Field, Pecos County, Texas, said rules being requested by Phillips Petroleum Company, and deemed necessary to assure prevention of waste and assure the adjustment of correlative rights and opportunities of each owner of gas in a common reservoir to produce and use or sell such gas as permitted by law; and

Whereas, A subsequent hearing was called by the Commission with due notice given to all interested parties wherein the matter of adjustment of correlative rights and opportunities of each owner to produce and use or sell gas was the principle subject matter, it being shown by Houston Oil Company, an interested party, that its well was being excluded from ratable production by the Permian Pipe Line Company, the purchaser in said field, apparently because of alleged contractual obligations between said purchaser and Phillips Petroleum Company; and

Whereas, From evidence and testimony adduced at said hearing, it was apparent to the Commission that the rules in effect were being used through the cooperative efforts of Permian and Phillips to limit the use of the gathering and plant facilities solely to Phillips' production, except for trivial amounts that were taken at irregular intervals from the Houston well, that a change in regulation was necessary to assure protection of the correlative rights of the parties in said field, that upon representation of counsel for Phillips the Commission concluded (1) that said company was interested in ratable take of gas from all wells completed in a common reservoir, (2) that in all probability fictitious nominations and forecasts of demand for gas from said reservoir were causing non-ratable take by the purchaser, (3) that there was a fixed demand, (4) that elimination of nominations and forecasts, and substitution therefor of a plant capacity figure for demand of gas from the reservoir would eliminate all fiction and allow ratable take by the purchaser; and

Whereas, From the evidence and testimony adduced at said hearing, including representations of counsel for Phillips, the Commission ruled March 1, 1956, that the field allowable be set at plant capacity; and

Whereas, After due notice, a hearing was held September 11, 1956, for the purpose of considering the application of Atlantic Refining Company, successor in interest to the

Houston Oil Company pertaining to purchasing of gas by Permian Pipe Line Company in the Puckett (Ellenburger) Field, which application pertains to the same problem which was considered corrected by the March 1, 1956 order; and

Whereas, From evidence and testimony adduced at said hearing, it appears that the problem existing in the prior hearings; namely, the matter of adjustment of correlative rights and opportunities of each owner of gas in a common reservoir to produce and use or sell such gas, is still present, that the action taken by the Commission effective March 1, 1956, in no way altered nor affected the actions of Permian and Phillips in their exclusion of the Atlantic well from ratable production, that during the period from March 1, 1956, to September 1, 1956, the Atlantic well accrued 467,395 mcf of gas of underproduction, and that additional underproduction has been accrued since the last date mentioned, that all such underproduction plus underproduction of 471,003 mcf of gas which had accrued prior to March 1, 1956, and was cancelled by operation of an existing rule, was accrued to the detriment of Atlantic despite the admonition of the Commission that non-ratable take was to be eliminated, that the accrual of such great amounts of underproduction was caused by the cooperative efforts of Permian and Phillips in excluding the Atlantic well from current production of allowables assigned by the Commission with the concurrent production of the full field demand for gas being taken from Phillips well only, thereby causing overproduction to accrue to the Phillips wells, that by skillful manipulation of wells' production Phillips successfully avoided shutdown of said overproduced wells, while the Atlantic well was subjected to cancellation of underproduction, that 471,003 mcf of cancelled underproduction has caused great loss to Atlantic, that continuation of operation of the field allowable and production in the present manner would cause cancellation of an additional 467,395 mcf accrued underproduction for the Atlantic well

on March 1, 1957, that the condition existing in the field at present will be further confused and confounded by the completion of additional wells in said field belonging to interests other than the parties mentioned herein; and

Whereas, Phillips contended that actually in its operation it had violated no rule, that the facilities employed in gathering and processing the gas were lease facilities of Phillips, that the rules presently operative were those the Commission could by law adopt, that any deviation in determination and distribution of allowables would be contrary to statutory authority of the Commission; and

Whereas, Permian, through counsel, stated it had no interest in the matter of allocation of allowables, that it was nothing more than a purchaser from Phillips, that it considered the gathering system and plant facilities as being Phillips own facilities, but that under contract it had constructed the gathering system and plant facilities, owned the facilities, employed the personnel to operate the facilities, and had actual physical connection to the Atlantic well as well as the Phillips wells and in fact took trivial amounts of gas from the Atlantic well, that it proposed to enlarge the facilities at which time additional capacity could be made available to Atlantic, that a market was available to any other producer who, like Phillips, made the gas marketable, that Permian would take all such gas made marketable by any other operator in said field; and

Whereas, Phillips and Permian both contend that by contract between said parties, they had made the gathering system and plant facility, though in fact owned and operated by Permian, a field facility of Phillips, and Phillips further contended that it could not be forced to apportion such facilities with any other producer in the same common reservoir, that any other producer had the duty to make their gas marketable as Phillips had done; and

Whereas, From evidence adduced at said hearing, the Commission finds:

(1) That the gas gathering facilities and processing plant operated by Permian in said field, contrary to the position taken by both Phillips and Permian, is an integral part of the Permian Pipe Line Company system, and that Permian is a common purchaser of gas at the wellhead from Phillips as well as from Atlantic.

(2) That Phillips and Permian by co-operative and concerted effort by virtue of a contract between said parties, have excluded the Atlantic well from its ratable share of the market demand for gas, as said ratable share was determined by the Commission in its administration of the rules for the subject field.

(3) That unless the regulation governing allocation of production and ratable take is adjusted to provide more rigid and equitable control said discrimination could probably continue with injury more widespread due to the increase in the number of producers and wells in said field.

(4) That by skillful manipulation of allowables and production with the use of the balancing rule, Phillips successfully avoided violation of the letter of any rule, yet it aided in exclusion of the Atlantic well from production by either encouraging or requiring Permian to take exclusively from its wells (as provided by contract) which is contrary to the intent of the proration and ratable take law.

(5) That Permian, possibly in error, considered the facilities used in gathering and processing the gas from said field to be Phillips facilities, and therefore not subject to apportionment to any other producer in the field, except with Phillips' consent.

(6) That the condition existent in the field is contrary to the intent of the law and the rules and regulations adopted thereunder for the adjustment of correlative rights and opportunities of each owner of gas in a common reservoir to produce and use or sell such gas as permitted by law; and·

Whereas, After carefully considering the evidence adduced and all the record in this matter, the applicable law, and its own rules and regulations, the Commission is of the opinion that the following changes must be made in the regulation of the Puckett (Ellenburger) Field, so that discrimination as practiced therein may be eliminated.

Now, Therefore, It Is Ordered By the Railroad Commission of Texas that effective November 1, 1956, that the rules for the Puckett (Ellenburger) Field, Pecos County, Texas, as adopted in Special Order No. 8–30,514, issued effective October 11, 1954, be and they are hereby amended by the adoption of the following additional rule:

Rule 6: (a) Allowables for gas wells in said field will be assigned by the Commission in accordance with the allocation formula described in Rule 4 hereof; said allowables to be shown on a Commission published schedule, as a schedule of percentage factors which will show each prorated wells' allowable in mcf of gas when multiplied by the total production of all prorated wells in the same reservoir. Factors will be shown for each possible condition of prorated and non-prorated wells and also the total reservoir production at which each change in condition will occur. The schedule of factors will be revised by the Commission only when necessary. Non-prorated wells will be assigned as allowable the actual amount of their production; provided, that amount is less than the amount they would receive under the allocation formula. No well will be assigned an allowable greater than the gas production during the official twenty-four (24) hour test on the latest Form GWT–2. Underproduction, if and when accrued to incapable wells, will be reallocated to prorated wells.

An actual "MCF of gas" figure will be substituted for the percentage allowable

figures for each well at a subsequent date, as soon as the actual reservoir gas production figures are available in the Commission Proration Department, and a schedule indicating the status of each well will be issued so that all interested parties may have available a record of gas production from the reservoir.

(b) Each common purchaser of gas connected to wells in said field is required to take ratably in accordance with the percentage allowable factors established by the Commission and is required to maintain all of the prorated wells connected to its facilities in substantially the same percentage status as to overproduction and underproduction. Each purchaser of gas from said field is required hereby to keep every other purchaser advised of his current market demand in order that each such party may be informed with regard to the applicable group of percentage allowable factors. Any well with an overproduced status greater than one hundred (100) percent of its average monthly allowable will be required to shut in until its status is again less than one hundred (100) percent. If the difference between the percentage status of wells connected to the same common purchaser of gas differs by an excessive amount the Commission may require wells with the greatest amounts of overproduction to be shut in until such wells are more nearly in balance.

(c) Under no circumstances will the allowable for the reservoir exceed that volume of gas that can be produced from each well therein without waste, such volume to be determined by the Commission, nor will the total monthly allowable exceed the amount produced from the reservoir during any certain month.

(d) Each common purchaser of gas in the Puckett (Ellenburger) Field shall file accurate purchaser's nominations with the Commission by the twentieth (20th) of each month indicating the amounts of gas to be taken from said field during the succeeding month, so that each producer and the Commission will have available to it a reasonable forecast of demand for that month.

It Is Further Ordered That the balancing rule stated as Rule No. 24(b) of the Conservation Rules and Regulations of Statewide Application and heretofore deemed applicable to the subject field is suspended from operation in said field unless and until further ordered by the Commission.

It Is Further Ordered That the underproduction accrued by virtue of the above-mentioned balancing rule to the Atlantic Refining Company, J. W. Robbins "A" No. 1 well and not cancelled by operation of said balancing rule at the effective date of this order is hereby perpetuated to be allowed as additional production in excess of an assigned daily allowable until such time as said underproduction has been produced, provided that said production in excess of daily allowable will be deducted from such of the Phillips Petroleum Company wells as are overproduced but only in such an amount and to the extent as the total of said wells overproduction, it being the intent of this order that the overproduction of the Phillips wells shall be balanced against the underproduction of the Atlantic well, and any excess overproduction, if such exists when underproduction is eliminated, will be cancelled to assure complete balance in the field insofar as accrued over and underproduction existent as of the effective date of this order.

It Is Further Ordered That Permian Basin Pipe Line Company, purchaser of gas from the subject field, is declared by the Commission to be a common purchaser of gas from the field, that all facilities furnished for one producer will be furnished to all other producers so that each producer will be afforded the opportunity to produce and market without restraint his ratable share of gas as determined by the Commission, that it will be the duty of said common purchaser to comply with any regulation deemed advisable and adopted by

the Commission to assure ratable take from said field.

It is the intent and purpose of this order that from and after November 1, 1956, the producers in said field and the common purchaser in said field will conduct their operations in such manner that takes from wells in said field will reasonably approximate the allowable assigned each of such wells so that each well will share ratably in the total field outlet, and operations to the contrary by any party will be adjudged in violation of Commission order and will be subjected to penalty action as provided by law.

It Is Further Ordered That this cause be held open on the docket for such other and further orders as may be necessary.

Chairman

Commissioner

Commissioner

ATTEST:

Secretary

FY:an

RAILROAD COMMISSION OF TEXAS
OIL AND GAS DIVISION

OIL AND GAS DOCKET NO. 126

§ 8 - 34421

IN RE: CONSERVATION AND PREVENTION OF
WASTE OF CRUDE PETROLEUM AND
NATURAL GAS IN THE PUCKETT
(ELLENBURGER) FIELD, PECOS
COUNTY, TEXAS

Austin, Texas
November 15, 1956

SPECIAL ORDER

SPECIFYING THE MANNER AND AMOUNTS THAT GAS WILL BE
TAKEN FROM ATLANTIC REFINING COMPANY AND PHILLIPS PETROLEUM
COMPANY WELLS BY PERMIAN BASIN PIPE LINE COMPANY;
SO THAT ACCRUED OVERPRODUCTION AND UNDERPRODUCTION IN
PUCKETT (ELLENBURGER) FIELD, PECOS COUNTY, TEXAS, MAY BE
ADJUSTED AS REQUIRED BY SPECIAL ORDER NO. 8-34,332,
ISSUED EFFECTIVE NOVEMBER 1, 1956

WHEREAS, The Railroad Commission of Texas, after due notice and hearing, promulgated and adopted Special Order No. 8-34,332, issued effective November 1, 1956, for the Puckett (Ellenburger) Field, Pecos County, Texas, wherein, among other things, said order provided:

"IT IS FURTHER ORDERED that the underproduction accrued by virtue of the abovementioned balancing rule to the Atlantic Refining Company, J. W. Robbins "A" No. 1 well and not cancelled by operation of said balancing rule at the effective date of this order is hereby perpetuated to be allowed as additional production in excess of an assigned daily allowable until such time as said underproduction has been produced, provided that said production in excess of daily allowable will be deducted from such of the Phillips Petroleum Company wells as are overproduced but only in such an amount and to the extent as the total of said wells overproduction, it being the intent of this order that the overproduction of the Phillips wells shall be balanced against the underproduction of the Atlantic well, and any excess overproduction, if such exists when underproduction is eliminated, will be cancelled to assure complete balance in the field insofar as accrued over and underproduction existent as of the effective date of this order."; and

WHEREAS, The Railroad Commission of Texas, in the letter of transmittal, ordered:

"In addition, you will also make arrangements with Atlantic Refining Company and Phillips Petroleum Company to adjust your takes from the Atlantic and Phillips wells so that the underproduction of the Atlantic which has been perpetuated by said order will be eliminated within a reasonable time. If agreement is not reached with respect to this matter at an early date, the Commission will establish a rate of production for said wells."; and

WHEREAS, It has been evidenced to the Commission that Permian Pipe line Company has not offered to comply with said order as of this time, nor has it responded to the Commission's advisory in any way so that the Commission can be assured that this matter is being adjusted as ordered.

NOW, THEREFORE, IT IS ORDERED By the Railroad Commission of Texas that effective November 15, 1956, Permian Basin Pipe Line Company adjust its takes in the Puckett (Ellenburger) Field so that underproduction accrued to the Atlantic Refining Company's J. W. Robbins "A" No. 1 well will be made up by production in excess of daily allowable to said well at the rate prescribed as follows:

Underproduction accrued to said well will be produced at a rate of 8000 mcf per day, said production to be added to the rate allowed as prorated production assigned to said well as its daily allowable.

Overproduction accrued to the Phillips' wells, namely, Evelyn O No. 1, Glenna "1" No. 1 and "2" No. 2, Odom "A" No. 1, Odom "U" No. 1, Odom "D" No. 1, Puckett "C" No. 1, Puckett "D" No. 1, Puckett "B" No. 1, Puckett "T" No. 1, Puckett "Y" No. 1 and Puckett "Z" No. 1, will be made up by restriction of production to less than each wells' daily assigned allowable, the total amount of which will equal 8000 mcf per day, the make up rate of each individual well to be that percentage of 8000 mcf that its overproduction bears to the total of all over-production existing for such wells. (See Attachment "A" schedule attached showing each of such overproduced wells' status.) It is recognized by the Commission that adjustment in make up rate may be necessary when the final total over-production and underproduction figures become available.

IT IS FURTHER ORDERED That the adjustment required by this order be inaugurated immediately.

IT IS FURTHER ORDERED That this cause be held open on the docket for such other and further orders as may be necessary.

RAILROAD COMMISSION OF TEXAS

Chairman

Commissioner

Commissioner

ATTEST:

Secretary

ORDER § 8 - 34421

SCHEDULE OF AMOUNTS TO BE SUBTRACTED
FROM THE DAILY PRORATED PRODUCTION OF PHILLIPS
PETROLEUM COMPANY, OVERPRODUCED WELLS TO
BALANCE THE ATLANTIC REFINING COMPANY,
J. W. ROBBINS "A" NO. 1 WELL'S ADDITIONAL
PRODUCTION OF 8000 MCFPD

| WELL | OVERPRODUCTION AS OF SEPTEMBER 1, 1956 | EACH WELL'S PERCENT OF OVERAGE | EACH WELL PART OF 8000 MCFPD |
|---|---|---|---|
| Phillips Petroleum Company | | | |
| Evelyn O No. 1 | -93735 | 17.37 | 1,390 |
| Fisher "A" No. 1 | -24636 | 4.57 | 366 |
| Glenna No. 1 | -89555 | 16.67 | 1,334 |
| Odom "A" No. 1 | -83184 | 15.42 | 1,234 |
| Odom "C" No. 1 | -31742 | 5.88 | 470 |
| Puckett "U" No. 1 | -47119 | 8.73 | 698 |
| Puckett "D" No. 1 | -100,359 | 18.60 | 1,488 |
| Puckett "B" No. 1 | -12831 | 2.39 | 190 |
| Puckett "C" No. 1 | -29212 | 5.41 | 433 |
| Puckett "Y" No. 1 | -26777 | 4.96 | 397 |
| TOTAL: | -539,551 | 100.00 | 8,000 |

ATTACHMENT "A"
SPECIAL ORDER NO. 8 -
NOVEMBER 15, 1956

Railroad Commission of Texas

Oil and Gas Division

Austin, Texas

Non-Associated Gas Proration Schedule—Puckett-Ellenberger Field—Pecos County, Texas
Effective November 1, 1956, Until Further Ordered by the Commission.

Participation Factors

| Operator and Lease | Well No. | Gross Acre Feet | BHP | Gross Acre Feet X BHP | GWT-2 Test | Factors if Daily Avg. is Less 74,200 MCF/Day | Factors if Daily Avg. is Over 74,200 MCF/Day |
|---|---|---|---|---|---|---|---|
| Atlantic Refg. Co. | | | | | | | |
| Robbins, J. W. "A" | 1 | 960.00 | 6520 | 6,259,200 | 9115 | .0877572 | .097043 |
| Phillips Pet. Co. | | | | | | | |
| Evelynjo | 1 | 1024.00 | 6496 | 6,651,904 | 7000 | .0932631 | .103132 |
| Fisher "A" | 1 | 1024.00 | 6665 | 6,824,960 | 7100 | .0956894 | Non-prorated |
| Glenna | 1 | 543.15 | 6688 | 3,632,587 | 7200 | .0509307 | .056320 |
| Glenna | 2 | 439.20 | 6611 | 2,903,551 | 7150 | .0407093 | .045017 |
| Odom "A" | 1 | 617.55 | 6602 | 4,077,065 | 7000 | .0571625 | .063211 |
| Odom "C" | 1 | 974.125 | 6690 | 6,516,896 | 7000 | .0913702 | .101039 |
| Odom "D" | 1* | 308.85 | 4632 | 1,430,593 | 1128 | Non-prorated* | Non-prorated |
| Puckett "C" | 1 | 747.60 | 6626 | 4,953,598 | 7250 | .0694520 | .076801 |
| Puckett "D" | 1 | 1024.00 | 6576 | 6,733,824 | 7060 | .0944116 | .104402 |
| Puckett "E" | 1 | 976.35 | 6659 | 6,501,515 | 7000 | .0911546 | .100800 |
| Puckett "K" | 1 | 1024.00 | 6491 | 6,646,784 | 7100 | .0931913 | .103052 |
| Puckett "L" | 1 | 568.55 | 6654 | 3,783,132 | 7000 | .0530414 | .058654 |
| Robbins "A" | 1 | 896.80 | 6511 | 5,839,065 | 7200 | .0818667 | .090529 |

*Well limited to actual production and exempt from shut in pressure requirements.
Puckett-Ellenberger Field
November, 1956
JSC:E                                                                                                          District 8

No findings of fact or conclusions of law were filed by the court.

The orders have the effect of prorating the production of gas from the Puckett-Ellenburger field, by allocating such production among the gas wells therein upon the basis of gross acre feet of pay time reservoir pressure and of requiring the appellee (Permian) to purchase ratably from the operators in the field the gas so produced. The orders also provide for the "make up" by Atlantic, one of the appellants, of the underproduction that had occurred to the Robbins "A" No. 1 well that had not been cancelled on September 1, 1956 by operation of the State-wide balancing rule.

The appeal in the Permian case is founded on eleven assignments of error.

The first and second points are directed to the action of the court holding the orders invalid because of the contract Permian had with Phillips and Atlantic to purchase gas in the Puckett-Ellenburger field, and in holding that the Plant facilities used in removing the $CO_2$ from the raw gas are so private in nature as to prevent regulation of the use, production and purchase of the gas in the manner prescribed by the said orders.

The third is that there was no attempt to change Permian's private status to a public status, and fifth the orders do not reflect an attempt to impair the obligations of contracts; sixth, the orders, if enforced, would not deny appellee equal protection of the law; do not encroach upon federal jurisdiction and would not be an undue burden on interstate commerce, and the orders

are not impossible to be complied with, and are not indefinite and uncertain, and finally that it was error for the court to grant both a temporary and permanent injunction, and the bond required was inadequate.

Appellants say that in the Phillips case the orders do fix allowables in compliance with Section 12 of Article 6008, that the orders are not invalid because they allow Robbins "A" No. 1 well to make up underproduction, and such makeup is authorized by Section 14 of Article 6008.

The Puckett-Ellenburger field was discovered by Phillips in July, 1952, and at the time of trial had 13 gas producing wells. The Robbins "A" gas well was completed in June, 1955, and was acquired by Atlantic in June, 1956. The Hammonds well was recently completed as a gas producing well.

The contract Permian has with Phillips, in part, is as follows:

"III(a)-1-B. The purpose of the dedication of recoverable reserves of gas well gas under the Pecos Acreage is to make available to Permian recoverable reserves of gas well gas sufficient to deliver to Permian average daily volumes of gas well gas containing volumes of pipe line gas ranging from twenty-five million (25,000,000) cubic feet per day of such pipe line gas to one hundred twenty-five million (125,000,000) cubic feet per day of such pipe line gas. It is, therefore, understood and agreed that Phillips shall have the right to produce gas well gas from the Pecos Acreage and use such gas or sell such gas to others than Permian, so long as there shall be reserves of gas well gas, determined pursuant to Article XX, underlying the Pecos Acreage sufficient to enable wells on such acreage, when fully developed to a density not to exceed one (1) well to six hundred and forty (640) acres, to produce and deliver to Permian during the remaining term of this contract, against a wellhead delivery pressure of eight hundred (800) psig, volumes of gas well gas containing volumes of pipe line gas equal to an average of one hundred and twenty-five million (125,000,-000) cubic feet per day of such pipe line gas, but in no event shall Phillips be obligated to maintain a total recoverable gas reserve containing in excess of a volume equal to seven hundred fifty billion (750,000,000,000) cubic feet of pipe line gas less the total cumulative volume of pipe line gas delivered hereunder."

"III(a)-1-E. It is specifically understood and agreed by the parties hereto that the volumes of gas Phillips shall be obligated to deliver to Permian from the Pecos Acreage under the terms of this contract shall be limited to the volumes of gas which can be legally produced from such acreage in compliance with the statutes of the State of Texas and with the provisions, spirit and intent of all legal and valid proration laws, rules and regulations of any duly constituted authority governing allowable production of natural gas from such acreage or from the gas wells drilled thereon, less the volumes of gas excepted and reserved as provided in this contract."

"III(a)-2-A. In the event Permian shall have received a certificate which Permian shall have advised Phillips is acceptable to Permian as provided in Section 2 of Article II hereof, then, beginning on December 1, 1953, Phillips shall sell to Permian and Permian shall purchase and receive, or pay for if not accepted, from the Pecos Acreage volumes of gas available for delivery hereunder up to a maximum daily average of twenty-five million (25,000,000) cubic feet of pipe line gas per day and Permian shall accept each day not less than a volume equal to ninety per cent (90%) of such average daily volume and except as otherwise provided in this article not more than one hundred

ten per cent (110%) of such average daily volume in any one (1) day."

"VII-3. The point of delivery for all gas well gas delivered to Permian hereunder from the Pecos Acreage pursuant to Article III(a) hereof shall be at the mouth of wellhead of the respective wells drilled on such acreage."

Permian is the principal purchaser of gas in the Puckett-Ellenburger field, and has purchased most of its gas from the Phillips wells, with a small amount from other operators, and thereby drained gas from beneath other leases.

Appellants take the position that in order to stop this practice that the Commission entered the orders limiting the production of each gas well to its fair share of the total gas produced therefrom and requiring the ratable purchase of such gas by appellee, Permian, under the power granted the Commission by Sections 10 and 12 of Article 6008 and under the provisions of the Common Purchaser Act. In 1954 the Commission adopted field rules allocating as production among the wells in the field upon the basis of the gross acre feet of pay assigned to each well multiplied by the reservoir pressure thereof.

Appellants contend that Phillips by dividing its proratable wells in groups and by under producing and over producing its groups of wells under the State-wide balancing rule then applicable to the field was able to take the market for gas, and cite as an example that from September, 1955 to October, 1956 the Robbins well produced 157,787,000 cubic feet of gas as a prorated field, whereas its share of actual production from prorated wells during this period, determined by use of the Commission's allocation formula, was 1,328,030,000 per cubic feet of gas. That during this same period of time Phillips wells produced greatly such wells' share of the actual production from prorated wells as determined by reference to the Commission's allocation formula.

The field outlet is approximately 44,000,000 cubic feet of gas well gas per day, appellee Permian is the principal purchaser and takes approximately 42,000,000 cubic feet of gas per day (approximately 2,000,000 cubic feet of gas is taken by a small local market).

On September 20, 1955, the Commission on its motion held a hearing to consider what should be done to insure ratable production of gas in the field and upon a basis of this hearing the Commission fixed the field allowable at a figure equivalent to the capacity of Permian's plant, and later on entered the orders hereinabove set out.

In its order the Commission recited the Phillips claims that the plant facilities of Permian were lease facilities of Phillips, but the Commission found that the plant was an integral part of the Permian Pipeline Company system.

On February 8, 1952, Permian and Phillips entered into a contract for the purchase and sale of gas, a portion of which has been hereinabove set out. This contract was amended in January, 1953, to make it applicable to Phillips leases in the Puckett-Ellenburger field.

Permian entered into an agreement with Houston (Atlantic), much like the Phillips, and, in part, reads:

"Subject to the terms and provisions hereof, Seller agrees to sell and deliver to Permian and Permian agrees to purchase and receive from Seller, or if available and not taken, pay for that quantity of pipeline gas which will afford Seller ratable production over a reasonable period of time with other natural gas purchased by Permian in the vicinity of Seller's leases, computed under such equitable and reasonable formulae as Permian shall from time to time employ; provided, however, Permian shall not be required to enlarge the treating capacity of its existing carbon dioxide removal plant in excess of the present capacity of such

plant prior to the time Permian would otherwise enlarge such capacity pursuant to the terms of the Gas Purchase Contract, dated February 8, 1952, as supplemented, between Permian and Phillips Petroleum Company; and, provided further, that Permian's obligations to take ratably hereunder shall be subservient to Permian's obligations to Phillips Petroleum Company, pursuant to said Contract; until said plant shall be so enlarged; and, provided further, that after Permian does enlarge such plant, Permian's obligations to take ratably hereunder shall cease to be subservient to Permian's said obligations to Phillips Petroleum Company and shall be equal to all other obligations of Permian with respect to such take."

Appellee, Permian, takes the position that the Commission found that Permian is a "Common Purchaser" of gas in the Puckett-Ellenburger field, and required it to furnish to all producers in the field, without discrimination, all facilities which it is furnishing to Phillips, and that this is the sole feature of the orders which directly affect it, and appellee says the said orders are illegal and void insofar as they declare it to be a "Common Purchaser" of gas in this field, and insofar as such orders direct it to make available to all producers in the field its facilities, constructed and operated under the contract with Phillips, and make nine counterpoints to the effect that the orders affect only correlative rights and are in conflict with a valid contract concerning correlative rights, and an endeavor to convert appellee's carbon dioxide removal plant into a public utility, and seek to impair the obligations of contracts, and deny appellee equal protection of law, and constitute a burden on interstate commerce, and encroach on the jurisdiction of the Federal Power Commission, and such orders are impossible for appellee to comply with, and are too indefinite and uncertain.

Appellee Phillips contends that the orders are invalid because the Commission did not comply with the terms of Article 6008, and further that the orders are invalid because the Commission is without authority to require a sharing of the carbon dioxide removal plant between Phillips and Atlantic, and that the Texas Common Purchaser Statute does not authorize the Commission to regulate the plant as a utility, and finally that the orders are discriminatory.

The contract Phillips and Permian entered into is dated February 8, 1952, and was supplemented on January 22, 1953. On January 20, 1956, a further supplemental agreement was entered into, and these supplemental agreements are applicable directly to the gas field in Pecos County and make certain amendments to the first agreement, and we believe that excerpts from the supplemental agreements will be sufficient for a general understanding of the agreement and its relation to the issues in this case.

Permian built its plant and began to take gas from Phillips on February 18, 1954, with a capacity of 44 million cubic feet of raw gas per day.

The agreement dated January 20, 1956, provided that Permian would enlarge its plant by January 1, 1957, to provide for a treatment of 95 million cubic feet of raw gas per day. The plant was not completed as planned but it is expected that it will be completed in April, 1957.

During the first eighteen months of the operation of the plant Phillips was the only producer of gas in the field. April 26, 1955, Permian and Houston Oil Company entered into a contract whereby Permian would purchase gas. The terms of this contract are substantially the same as that between Permian and Phillips.

Section 1 of Article III of the contract provides that:

"Subject to the terms and provisions hereof, Seller agrees to sell and deliver to Permian and Permian agrees to purchase and receive from Seller, or if available and not taken, pay for that

quantity of pipeline gas which will afford Seller ratable production over a reasonable period of time with other natural gas purchased by Permian in the vicinity of Seller's leases, computed under such equitable and reasonable formulae as Permian shall from time to time employ; provided, however, Permian shall not be required to enlarge the treating capacity of its existing carbon dioxide plant in excess of the present capacity of such plant prior to the time Permian would otherwise enlarge such capacity pursuant to the terms of the Gas Purchase Contract, dated February 8, 1952, as supplemented, between Permian and Phillips Petroleum Company; and, provided further, that Permian's obligations to take ratably hereunder shall be subservient to Permian's obligations to Phillips Petroleum Company, pursuant to said Contract, until said plant shall be so enlarged; and, provided further, that after Permian does enlarge such plant, Permian's obligations to take ratably hereunder shall cease to be subservient to Permian's said obligations to Phillips Petroleum Company and shall be equal to all other obligations of Permian with respect to such take."

Houston drilled the Robbins "A" well and began delivering gas to Permian's plant November 20, 1955.

Atlantic purchased certain property including the Robbins "A" well, and assumed Houston's obligations of the contract with Permian.

On September 11, 1956, the Commission held a hearing on a complaint made by Atlantic and on November 1, 1956 entered one of the orders under attack, which in part reads:

"It Is Further Ordered That Permian Basin Pipeline Company, purchaser of gas from the subject field, is declared by the Commission to be a common purchaser of gas from the field,

that all facilities furnished for one producer will be furnished to all other producers so that each producer will be afforded the opportunity to produce and market without restraint his ratable share of gas as determined by the Commission, that it will be the duty of said common purchaser to comply with any regulations deemed advisable and adopted by the Commission to assure ratable take from said field.

"It is the intent and purpose of this order that from and after November 1, 1956, the producers in said field and the common purchaser in said field will conduct their operations in such manner that takes from wells in said field will reasonably approximate the allowable assigned each of such wells so that each well will share ratably in the total field outlet, and operations to the contrary by any party will be adjudged in violation of Commission order and will be subjected to penalty action as provided by law."

■ We do not believe that the orders are invalid and void but are within the power and authority of the Commission.

Section 10 of Article 6008 provides:

"It shall be the duty of the Commission to prorate and regulate the daily gas well production from each common reservoir in the manner and method herein set forth. The Commission shall prorate and regulate such production for the protection of public and private interests:

"(a) In the prevention of waste as 'waste' is defined herein;

"(b) In the adjustment of correlative rights and opportunities of each owner of gas in a common reservoir to produce and use or sell such gas as permitted in this Article."

Section 12 of Article 6008 is:

"It shall be the duty of the Commission to determine the status of gas pro-

duction from all reservoirs in this state. If and when the Commission finds that waste exists or is imminent in the production of gas from any reservoir, or that the capacity of the wells to produce gas from any reservoir exceeds the market demand for gas from such reservoir, the Commission shall then proceed by proper order to prorate and regulate the gas production from such reservoir on a reasonable basis. On or before the 20th day of each month, the Commission, after notice and hearing, shall determine (1) the lawful market demand for gas to be produced from each such reservoir during the following month; and (2) the volume of gas that can be produced from such reservoir and each well therein during the following month, without waste. The Commission shall then fix the monthly reservoir allowable of gas to be produced from such reservoir at the lawful market demand therefor or at the volume that can be produced from such reservoir without waste, whichever is the smaller quantity. The monthly reservoir allowable shall be allocated among all wells entitled to produce gas therefrom so as to give each well its fair share of the gas to be produced from the reservoir, provided that each well shall be restricted to the amount of gas that can be produced from it without waste. The volume of gas so allocated to each well shall be regarded as the monthly allowable for such well. The daily market demand for gas, and the daily allowable, shall be determined by dividing the monthly demand and the monthly allowable by the number of days in the month."

The Common Purchaser Act, Section 8a of Article 6049a, reads:

"That in order to further conserve the natural gas resources of this State every person, association of persons, joint stock company, limited co-partnership, partnership, corporation, gas pipe line company or gas purchaser now, or hereafter, claiming or exercising the right to carry or transport natural gas by pipeline, or pipe lines, for hire, compensation or otherwise within the limits of this State, or which is now engaged or shall hereafter engage in the business of purchasing, or taking, natural gas, or residue gas or casing-head gas shall be a common purchaser thereof, and shall purchase, or take, such gas under such rules or regulations as may be prescribed by the Commission, in the same manner, under the same inhibitions against discriminations and subject to the same provisions as are herein set out with respect to common purchasers of oil."

It is to be observed that sections 10 and 12 of Article 6008 have as their objective ratable production, and that section 8a of Article 6049a, the Common Purchaser Act, seeks to insure ratable take.

Ratable production and ratable take or purchase are essential in preventing drainage between leases, and are related to the prevention of above-ground waste, because if a producer cannot share in the domestic full market, the operator will try to find some other market, one which might be inferior use of gas such as the manufacture of carbon black.

Common Purchaser statutes are more vital to gas producers than to producers of oil since gas cannot be as readily stored as can oil, and is not transportable by truck.

The orders involved herein were adopted to bring about ratable production of gas in the field and the requirement that appellee as a common purchaser purchase ratably is for the purpose of insuring ratable production, and only require appellee to purchase ratably.

The contracts do not prevent exercise by the Commission of its authority; they expressly recognize that the Commission

has such duty and responsibility to enter conservation orders and to fix allowables.

■ We do not believe that the contracts, if they relieve Permian of its duty to purchase ratably, are to that extent valid.

Lone Star Gas Co. v. Municipal Gas Co., 117 Tex. 331, 2 S.W.2d 790, 78 A.L.R. 797.

■ We do not believe that the orders require Permian to make public use of private facilities, since the facilities used to remove the $CO_2$ content are part of its pipeline system, and the orders are supported by substantial evidence.

Appellee Permian has placed in its rate base the cost of constructing the facilities used by it to remove $CO_2$ from gas produced in this field. The Federal Power Commission is fixing the rates or charges for gas made by Permian may consider as a part of its rate base the cost of the facilities used by it to remove $CO_2$ from Puckett-Ellenburger gas.

In the Texoma Natural Gas Co. v. Railroad Commission, D.C.W.D.Tex., 59 F.2d 750, case the Court held that the Common Purchaser Act was invalid insofar as the operations of Texoma were concerned and insofar as the Commission's order sought to force Texoma to make new contracts of purchase from others. Texoma was transporting only gas produced from its own wells and was not purchasing gas from others.

We do not believe that the orders encroach upon Federal jurisdiction, and do not unduly burden interstate commerce, if enforced, and that the State has regulatory powers.

Interstate Natural Gas Co. v. Federal Power Commission, 331 U.S. 682, 67 S.Ct.

1482, 91 L.Ed. 1742; Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333; Cities Service Gas Co. v. Peerless Oil & Gas Co., 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190; Sinclair Pipe Line Co. v. Snyder, D.C.D. Kan., 147 F.Supp. 632.

We do not believe that Phillips' contention that the orders are invalid because the Commission did not comply with the terms of Article 6008 is well taken.

Section 10, Subdivision (b), requires the Commission to prorate gas in the adjustment of correlative rights and opportunities of each owner of gas in a common reservoir to produce and use or sell gas as permitted in this Article.

"The Commission shall be vested with a broad discretion in administering this law, and to that end shall be authorized to adopt any and all rules, regulations or orders which it finds are necessary to effectuate the provisions and purposes of said law." Section 22.

The record is very long in these cases and we have not attempted to review the evidence in detail. The orders themselves, based on the fact findings by the Commission, which we believe to be supported by the evidence, are self-explanatory.

We therefore believe that it was error for the court to hold the orders invalid.

The judgments are reversed and the injunctions dissolved and judgment here rendered for appellants.

Reversed and injunctions dissolved and judgment rendered.

HUGHES, J., disqualified, not sitting.