**RAILROAD COMMISSION of Texas et al., Appellants,**

v.

**M. B. RUDMAN et al., Appellees.**

**No. 10821.**

Court of Civil Appeals of Texas.

Austin.

Feb. 22, 1961.

Rehearing Denied March 15, 1961.

Will Wilson, Atty. Gen., Houghton Brownlee, Jr., Linward Shivers, John Wildenthal, Jr., Asst. Attys. Gen., for Railroad Commission of Texas.

Powell, Rauhut, McGinnis, Reavley & Lochridge, Austin, for Lone Star Producing Co.

Black & Stayton, Austin, for Christie, Mitchell and Mitchell Co.

John E. Taylor, Marshall, Raymond A. Williams, Jr., Dallas, Hart & Hart, Austin, for appellees.

HUGHES, Justice.

M. B. Rudman and others, who own the working interest in and who operate six gas wells in the Buffalo and South Buffalo fields in Leon County seek, by this suit filed by them, to justify the production of gas valued at $76,000 from such wells during the months of August, September, October, November and December, 1959, in excess of the amount of production fixed by the Railroad Commission of Texas for such wells for such periods.

The appeal here is actually from an order of the Commission shutting the wells in until the overproduction mentioned was overcome. The real question presented, however, is the validity of the proration order in force during the period in which the questioned production occurred.

If such order is invalid, then it is conceded that appellees' production during such period was within the limits prescribed by the proration order in force in the fields immediately prior to the order here involved.

The Railroad Commission of Texas and its members were officially sued.

Christie, Mitchell and Mitchell Company and Lone Star Producing Company intervened and were aligned with the Commission.

Trial below resulted in a judgment holding the proration order of the Commission to be void and enjoining enforcement of the shut in order.

It is our opinion that this judgment is erroneous, and that the attacked order of the Commission is valid. Our reasons for this conclusion are twofold. One reason is that the validity of a similar order was adjudicated by this Court and the Supreme Court in Railroad Commission of Texas v. Permian Basin Pipe Line Company, Tex. Civ.App., 302 S.W.2d 238, writ ref., N.R.E. The other reason is that such opinion is correct.

The order complained of is known in the profession as a "Henze-type order."

Rules 5 and 7 for the South Buffalo and Buffalo fields, respectively, were adopted by the Commission August 20, 1959. These rules are substantially the same. We copy Rule 7:

"Rule 7: (a) Allowables in the Buffalo (Woodbine Sand, Gas) Field will not be assigned until the month following the month in which monthly production reports (Form 3–266–A) are due in the Commission's District Office. Limited capacity wells will be assigned allowables in the amount of their actual production, provided, this allowable is less than such well would receive under the allocation formula described in Rule 6(a). No well will be assigned an allowable greater than the gas production during the official twenty four (24) hour test on the latest Form GWT–2. On, and after the effective date of this order, however, the Commission will issue a schedule of factors based on Rule 6(a) which will give each well's allowable when multiplied by the total production of all prorated wells in the same reservoir. Factors will be shown for each possible condition of prorated and non-prorated wells. The total reservoir production at which each change in this condition will occur will also be shown. The schedule of factors will be revised by the Commission when and if necessary. As soon as possible after the month in which monthly production reports (Form 3–266–A) are due in the Commission's District Office, the Commission will issue another schedule which will show each well's allowable, production, and cumulative under production or overproduction status as

of the beginning and end of the month reported in MCF (Thousands of Standard Cubic Feet).

"(b) Distributors, transporters, or purchasers of gas in the Buffalo (Woodbine Sand, Gas) Field may take sufficient gas from the wells connected to their facilities to meet their current market demand provided the producing rates of individual wells as related to the total market demand are maintained as nearly as possible in proportion to the factors published by the Commission. Each purchaser in the field will be required to advise the other purchasers in the field of his expected current market demand in order that each party may be informed with regard to the proper group of factors which will be applicable.

"(c) Any well which becomes overproduced in an amount equal to or more than its allocated allowable for the two months preceding will be shut in until its overproduction has been reduced by subsequent allocation of its monthly share of the field allowable to an amount not exceeding its allowable for the then current month. Any well which is overproduced in excess of one month's allowable on either of the Commission's six months balancing dates of March 1 and September 1 shall be shut in and remain shut in until its accrued overproduction is made up.

"(d) Any well which fails to produce its assigned allowable for six consecutive months shall automatically be considered a limited capacity well and shall thereafter be assigned as an allowable an amount not to exceed its average daily production during the preceding three months period. When a well is classified as limited capacity under the preceding provision of Rule 7(d), its accrued underproduction shall be redistributed among the capable wells in the field in accordance with each well's proration factor as determined under Rule 6(a).

"Any well which has been classified as limited capacity may be restored to normal status by the operator or purchaser filing a new daily production test (Form GWT-2) which has been witnessed by a representative of the Railroad Commission and which test indicates that said well is again capable of producing its allowable as calculated under Rule 6(a).

"(e) Purchaser Nominations will be filed with the Commission by the twentieth (20th) day of each month indicating the amounts of gas to be taken from the reservoir during the succeeding month, so that each producer and the Commission may have available to it the total forecast of demand for each reservoir; provided, however, that said Purchaser Nominations will not be used in the determination of allowables for the individual wells."

In Permian, supra, Phillips' pleading in the Trial Court alleged:

"The method of assigning allowed production to individual wells as provided in Rule 6(a) of the amendatory Order is contrary to the statutory requirement contained in Sec. 12 of Article 6008, that the Commission shall, on or before the twentieth day of each month, determine the lawful market demand for gas from such reservoir and if such volume can be produced without waste, shall then allocate the monthly reservoir allowable, which is the market demand therefrom, to all wells in the field entitled to produce gas. No question of waste is involved."

In this Court, Phillips presented the following counterpoint:

"a) The Order of November 1, 1956 fixing a well's allowable from past production ignores the manner and method called for in Section 12."

Section 12, referred to by Phillips was Sec. 12 of Art. 6008, Vernon's Ann.Civ.St., which we copy in full:

"Sec. 12. It shall be the duty of the Commission to determine the status of gas production from all reservoirs in this state. If and when the Commission finds that waste exists or is imminent in the production of gas from any reservoir, or that the capacity of the wells to produce gas from any reservoir exceeds the market demand for gas from such reservoir, the Commission shall then proceed by proper order to prorate and regulate the gas production from such reservoir on a reasonable basis. On or before the 20th day of each month, the Commission, after notice and hearing, shall determine (1) the lawful market demand for gas to be produced from each such reservoir during the following month; and (2) the volume of gas that can be produced from such reservoir and each well therein during the following month, without waste. The Commission shall then fix the monthly reservoir allowable of gas to be produced from such reservoir at the lawful market demand therefor or at the volume that can be produced from such reservoir without waste, whichever is the smaller quantity. The monthly reservoir allowable shall be allocated among all wells entitled to produce gas therefrom so as to give each well its fair share of the gas to be produced from the reservoir, provided that each well shall be restricted to the amount of gas that can be produced from it without waste. The volume of gas so allocated to each well shall be regarded as the monthly allowable for such well. The daily market demand for gas, and the daily allowable, shall be determined by dividing the monthly demand and the monthly allowable by the number of days in the month."

The pertinent portion of the November 1, 1956, Commission order attacked by

Phillips in Permian are set out in full in our opinion in that case and will not be repeated here.

The following quotation is taken from the brief of Phillips filed in the Permian case in this Court:

"* * * The statute then provides that the monthly reservoir allowable, that is, the one the Commission determines on or before the 20th day of the month, based on market demand limited by waste, and not anything else, shall be allocated among all wells entitled to produce gas therefrom so as to give each well its fair share of the gas to be produced from the reservoir. The language of Section 12 expels appellants' view that anything other than the 'lawful market demand' as determined on or before the 20th day of each month shall be divided among the wells as their assigned allowables. There is not a single phrase in Section 12 or elsewhere in Article 6008 that suggests that a well's allowable shall be determined by the volume of gas the field has produced or that a well has produced in the past, except insofar as Section 14 may have application. Appellants have concocted a method of retroactive proration which is wholly inconsistent with the clear express language of Section 12."

This Court in disposing of the counterpoint and argument presented by Phillips in Permian said [302 S.W.2d 254]:

"We do not believe that Phillips' contention that the orders are invalid because the Commission did not comply with the terms of Article 6008 is well taken.

*   *   *   *   *   *

"We therefore believe that it was error for the court to hold the orders invalid."

The first point presented by Phillips in its application for writ of error filed in the Permian case reads:

"The Court of Civil Appeals erred in not holding the order of November 1, 1956, invalid because it prorates the field's 'past production' among the wells of the field instead of the 'lawful market demand' as determined by the Commission on or before the 20th day of each month. Section 12, Article 6008."

Under this point Phillips made an extended argument from which we quote the following:

"Section 12 requires, where waste exists or is imminent or where the reservoir capacity to produce exceeds the market demand, that the Commission on or before the 20th day of each month shall determine, (1) the lawful market demand for gas to be produced during the following month, and (2) the volume of gas that can be produced without waste. This predetermination is required regardless of waste where the market demand is less than the capacity of the reservoir to produce. The Commission shall then (at that time) fix the monthly reservoir allowable of gas to be produced from such reservoir at the lawful market demand, or at the volume that can be produced from such reservoir without waste, whichever is the smaller quantity. The statute then provides that the monthly reservoir allowable, that is, the one the Commission determines on or before the 20th day of the month, based on market demand limited by waste, and not anything else, shall be allocated among all wells entitled to produce gas so as to give each well its fair share of the gas to be produced from the reservoir. The language of Section 12 expressly expels the respondents' view that anything other than the 'lawful market demand,' as determined on or before the 20th day of each month shall be allocated among the wells. There is not a single phrase in Section 12 or elsewhere in Article 6008 that authorizes the Commission to determine a well's monthly allowable by the volume of gas the field has produced. Under the express language of the statute the Commission is neither authorized to make the determination of a well's allowable after production has occurred, nor is it authorized to base that determination upon the amount of gas the field has actually produced. Respondents have concocted a method of retroactive proration which is wholly inconsistent with the express language of Section 12."

The Trial Court's judgments in the combined Phillips and Permian cases adjudicated the invalidity of the Commission order of November 1, 1956, and enjoined the Commission from enforcing it.

It seems to us that the action of the Supreme Court in denying a writ of error in the Permian case because it found no reversible error in our opinion had the necessary effect of approving our opinion to the extent that we sustained the validity of the orders of the Commission; otherwise, the Supreme Court could not have approved our judgment reversing the judgment of the Trial Court and rendering judgment dissolving the injunction restraining enforcement of the orders involved.

The similarity between the Commission's order in Permian and here are obvious, and appellees do not contend to the contrary. They do point out that Commissioner Culberson dissented from the proration orders before us in this case.

As we understand the objections made by Judge Culberson they were not based upon ground that the order was illegal, or was not authorized under Art. 6008, supra, but that he could find "no present justification for a Henze type order at this time."

The similar order under attack in Permian was signed by Judge Culberson, and there was no dissent. It is also to be noted that Judge Culberson signed the shut down

order from which this appeal was taken by appellees.

Appellees seek to distinguish the Permian case on the ground that there were other, and probably more important, issues presented there; also that field and market conditions were not the same as here.

These distinctions may well be, but they do not efface the rule of stare decisis nor the obligation of this Court to respect an adjudication by the Supreme Court which we consider to be applicable to the question before us.

Appellees also direct our attention to the fact that in the Permian case there was a pre-existing unrepealed order of the Commission which fixed the field allowable for the Puckett field at a figure equivalent to to the capacity of the cleansing plant through which the gas from such field had to pass before it became pipeline gas. The maximum capacity of the plant was known and appellees say that by applying the percentage factors to this plant capacity the allowable volume of gas could be accurately ascertained in advance. This is quite true provided the plant was never out of commission and market demand was constant at plant capacity. That neither of these elements would ever vary or fail is, of course, without reason.

Furthermore, it is our opinion that the subsequent Henze-type proration order in Permian being inconsistent with the prior order, superseded such order whether expressly repealed by the Commission or not.

In Permian there was, no doubt, a more solid basis for estimating market demand under the Henze-type order than here, but it was still nothing more than a "forecast."

Under a Henze-type order the Commission does not fix in stated cubic feet of gas the allowable of a gas well. Instead, the Commission assigns a percentage factor to each well, thereby allowing each well to produce a certain percentage of the total gas produced from the field. After a partic-

ular month has passed, the Commission determines the actual production from the field during that month, the actual production by each well during that month, and by applying the percentage factor of each well to its actual production determines whether the well was underproduced or overproduced during the month. This underproduction or overproduction is to be made up in following months.

For example, the proration schedule adopted for the Buffalo field effective August 1, 1959, gave appellees' Hill No. 1 well a participation factor of .0286506. After the Commission ascertained the actual production from the Buffalo field during the month of August and the actual production by appellees' Hill No. 1 well during the month of August, it applied the above stated participation factor to the well's actual production and determined whether the well was underproduced or overproduced for the month of August. Under Commission practice this determination is made during the month following the month in which the production occurs. In the example given, however, the determination was made in the month of October.

We state here, and emphasize later, that appellees do not question the accurateness nor validity of the "percentage factor" fixed for their wells by the Commission in those fields.

Sec. 12 of Art. 6008, V.A.C.S., provides in part that, "The monthly reservoir allowable shall be allocated among all wells entitled to produce gas therefrom so as to give each well its fair share of the gas to be produced from the reservoir, * * *"

Appellees' "fair share" of the gas to be produced from the Buffalo field was set by the Commission at about 5% of its total gas production.

In August 1959, appellees produced from this field about 50% of the field's total production, or about 10 times its "fair share" as established by the Commission.

To demonstrate the avariciousness of this production by appellees, the record shows that this field would have had to have produced for this month more than four times its highest monthly production for the preceding year in order for the amount taken to have been their "fair share."

Other inequities and inequalities caused by appellee's unbridled production during the time in question could be stated.

Appellees do not question the validity of the order or orders in suit on the ground that under them they were deprived of their "fair share" of the gas from the Buffalo fields.

They defend their gainful overproduction in violation of the Commission rules solely on the ground that such rules are illegal, unconstitutional and void.[1]

The illegality of the orders is alleged to consist of a violation of Art. 6008, V.A.C.S., in two particulars: The allowable per well was not stated in volume (cubic feet or other standard measurement) and was not prospectively fixed.

The constitutional objection is based on Art. 1, Sec. 16, of our Constitution, Vernon's Ann.St., prohibiting retroactive laws, and Art. 1, Secs. 17 and 19, Texas Constitution, and the Fourteenth Amendment of the United States Constitution, prohibiting confiscation of property without adequate compensation, and the taking of property without due process of law.

■ We will dispose of the constitutional questions first, briefly, and perhaps abruptly.

"A statute (rule here) cannot be said to be a retroactive law prohibited by the Constitution unless it can be shown that the application of the law would take away or impair vested rights ac-

quired under existing law." McCain v. Yost, 155 Tex. 174, 284 S.W.2d 898, 900.

"Existing law," Art. 6008, supra, entitled appellees to a "fair share" of the gas produced from the Buffalo fields. They had no right, certainly no "vested right" to gas produced by them in excess of their "fair share."

That appellees are being deprived of their property in an unconstitutional manner, or that they are being retroactively punished is completely untenable. Unless being compelled to disgorge is punishment, appellees are not penalized. It is not an unconstitutional deprivation of property nor punishment to be required to surrender what one was never lawfully entitled to receive or keep.

Appellees knew, under concededly valid statutes and rules of the Commission, that they were entitled to produce only a certain percentage of the Buffalo fields total production as their "fair share" of such gas. They knew, or should have known, that if they produced more than this amount that they should be, and would be, called to account. The Commission here has done no more than this. It could, in our opinion, have properly done no less.

■ The objection that the order of the Commission in suit does not state in cubic feet or some other standard method of measuring gas, the amount of gas which appellees could produce is, we think, without substance.

Sec. 12 of Art. 6008, supra, uses four expressions relating to amounts of gas subject to regulation by the Commission, "gas production," "market demand for gas," the "volume of gas," and "allowable of gas."

It is common knowledge that the usual measure of gas is in cubic feet, and one cubic foot being so small in value that for

---

1. This being a collateral attack on the proration orders in suit, appellees are entitled to no relief unless such orders are void. Texas Steel Co. v. Fort Worth & D. Ry. Co., 120 Tex. 597, 40 S.W.2d 78.

business purposes volume of gas is ordinarily stated in MCF's, 1,000 cubic feet.

This does not mean, however, that the Commission would be required to perform purely mathematical exercises for the interested parties, provided the Commission supplied the formula from which the correct number of cubic feet of gas could be derived. This the Commission did as to appellees' fair share of the gas produced from the Buffalo fields. After actual field production was known, there could be no mistake in determining appellees' fair share, in cubic feet, of the gas produced, and no mistake is claimed.

██ The remaining question, and in our opinion the only serious question presented, is whether the Henze-type order here involved complies with the provision of Sec. 12, supra, providing that the Commission shall, on or before the 20th day of each month determine the lawful market demand for gas to be produced from a reservoir during the following month and the volume of gas that can be produced from such reservoir and each well therein during the following months, without waste.

It is beyond dispute that the Commission did not on or before the 20th of the month fix the exact number of cubic feet of gas which the reservoirs and each well in the reservoirs could lawfully produce the following month. Is this required? Considering Art. 6008, in its entirety and considering the nature of the gas business, we think not.

The question of "waste" aside, the controlling factor in establishing the monthly reservoir allowable[2] is "lawful market demand."

Gas cannot be easily stored; hence only gas which is sold and delivered is actually produced.

It is practically impossible for the Commission to know in advance the exact amount of gas which will be required in any given month to satisfy actual market demand.

It would seem that nominations for gas made by potential purchasers would be the best forecast of market demand which could be found. Certainly the Commission would not know more about the need for gas than the persons who buy and use it.

Experience proves, however, that nominations made by purchasers of gas are often inaccurate. Many conditions contribute to this instability of forecasts such as the weather and the general hazards and vicissitudes of business.

The "fair share" of each well in the production from a common reservoir in a given month can only be accurately and finally determined after actual production and the expiration of the month.

The general purpose of the Legislature in enacting Art. 6008 is shown by its following provisions:

Sec. 1 states:

"In the recognition of past, present, and imminent evils occurring in the production and use of natural gas, as a result of waste in the production and use thereof in the absence of correlative opportunities of owners of gas in a common reservoir to produce and use the same, this law is enacted for the protection of public and private interests against such evils by prohibiting waste and compelling ratable production."

Section 10, in part, states:

"It shall be the duty of the Commission to prorate and regulate the daily gas well production from each common reservoir * * * In the adjustment of correlative rights and opportunities

---

2. We will not further discuss per well allowables because the formula by which each well is allotted its fair share of the reservoir production, called participation factor, is not attacked.

of each owner of gas in a common reservoir to produce and use or sell such gas as permitted in this Article."

The provisions of Sec. 12, providing that each well shall receive its "fair share" of the production from a common reservoir have already been noted.

Consistent with these basic objectives of the Legislature, Secs. 14 and 18 recognize and take into account the very problem with which the Commission dealt when it entered the order in suit. These sections provide:

"Sec. 14. In order to adjust the correlative rights and opportunities of each owner to produce, use and sell gas from a common reservoir from which a portion of the market demand is seasonal or where a portion thereof fluctuates from month to month, the Commission may permit the wells in such reservoir to be produced in excess of the monthly allowable if no waste is occasioned thereby, provided (1) no well shall in any one month be permitted to produce in excess of twice its monthly allowable or to produce at a rate in excess of twenty-five (25%) per cent of the daily producing capacity of such well as found by the Commission; that (2) when any well that has produced twice its allowable for six successive months shall be closed in until its production and allowable are in balance, and that (3) the Commission shall, on the 1st day of March and September of each year, restrict production from all wells that are then overproduced to such fractional part of their monthly allowable as will bring the accumulated allowables and the accumulated monthly production in balance during the next six months. In like manner the Commission may by appropriate order permit any gas well to be underproduced for a period of six consecutive months and may allow the accumulated underproduction to be produced in addition to the regular monthly allowable during the following six months period."

"Sec. 18. When unforeseen contingencies increase the demand for gas required by any distributor, transporter or purchaser to an amount in excess of the total allowable production of the wells to which he is connected, such distributor, transporter or purchaser is authorized to increase his take ratably from all such wells in order to supply his demand for gas, provided, however, that notice of such increase and the amount thereof shall be given to the Commission within five (5) days; and provided further that the Commission, at its next hearing, shall adjust the inequality of withdrawals caused by such increase in fixing the allowable production of the various wells in the common reservoir or zone."

It is our opinion that the Legislature in enacting Art. 6008 devised a scheme to meet the practical problems presented in guaranteeing to each producer his fair share of the gas produced from a common reservoir. To insure this objective against the uncertainties of estimating future gas production, the Legislature wisely and prudently provided that overproduction and underproduction should be brought into balance at stated intervals and in a stated manner.

As experience is gained in a field and its markets, the less the margin of error in estimating its monthly allowable and the allowables of each well.

If wide variation between estimates and actual production cause hardship, it is, we believe, but an incident to the nature of the business of producing and selling gas. Such hardship cannot, in our opinion, be alleviated by allowing production of gas by a producer in excess of his "fair share" of the total field production.

It is our opinion that the order of the Commission which appellees violated is not subject to any of the legal objections

advanced by appellees, and that it was a valid order.

It follows that appellees were not justified in violating this order and that the order of the Commission shutting down appellees' wells until their production was brought in balance was a proper and valid order.

On April 14, 1960, we entered an order agreed to by all parties, relating to the production of gas from the so-called "Rudman wells" pending the outcome of this suit. This order is continued in effect only for ten days after our jurisdiction of this cause ceases or the jurisdiction of the Supreme Court of Texas attaches by filing application for writ of error, whichever is the earlier date.

The judgment of the Trial Court is reversed and judgment is here rendered that appellees take nothing by their suit.

Reversed and rendered.