UNITED GAS CORPORATION V. SHEPHERD LAUNDRIES COMPANY, INCORPORATED.

No. A-331. Decided July 18, 1945.
Rehearing overruled October 17, 1945.
(189 S. W., 2d Series, 485.)

*Baker, Botts, Andrews & Wharton* and *Walter H. Walne,* all of Houston, and *Black, Graves & Stayton* and *Charles L. Black,* all of Austin, for petitioner.

The Court of Civil Appeals erred in holding that the lowest rate extended by a utility to any customer, even though in violation of the discrimination statute (Article 1438) lowers the rate as to all other customers; that is, that the lowest rate charged any of its customers becomes the lawful rate for all of them. Postal Telegraph Co. v. Associated Press, 228 N. Y. 370.

127 N. E. 256; Texas Power & Light Co. v. Hilltop Baking Co., 78 S. W. (2d) 718; Texas Power & Light Co. v. Doering Hotel Co., 139 Texas 351, 162 S. W. (2d) 938.

*Edward S. Boyles* and *M. U. S. Kjorlaug,* both of Houston, for respondent.

The lowest rate fixed or charged consumers of any class, by the utility itself, becomes the lawuful rate for that class to which all consumers in that class are entitled. United Fid. Life Ins. Co. v. Adair, 29 S. W. (2d) 944; Conley v. Abrams, 7 S. W. (2d) 674; Glass v. Great Southern Life Ins. Co., 170 S. W. 247; 9 Am. Jur., sec. 205.

MR. JUDGE FOLLEY, of the Commission of Appeals, delivered the opinion for the Court.

This suit was instituted in Harris County by the respondent, Shepherd Laundries Company, Inc., against the petitioner, United Gas Corporation, for damages because petitioner charged respondent a higher rate for natural gas furnished it in Houston for certain periods between June, 1934, and October, 1942, than it did other customers in that city "under similar and like circumstances." The petition of respondent charges that during such period the gas company, and its predecessors in business, supplied gas to respondent at 19c per 1000 cubic feet for the first 1000 per month, 18c for the next 9000 cubic feet, and 17c for all additional gas used during the month, while during the same period gas was furnished to other customers similarly situated at lower rates. This suit is for the difference between the rate paid by respondent and the lower rate paid by other similar customers. Based upon jury findings that the favored customers were served under similar and like circumstances, and undisputed facts that they received gas at lower rates, judgment was rendered for respondent in the some of $5094.10, which was affirmed by the Court of Civil Appeals. 181 S. W. (2d) 929.

The petitioner's chief contention is that respondent is not entitled to recover because no claim was made that the rate charged it was unreasonable or that the lower rate given to other customers caused respondent any loss or damage in its business. In this connection it further asserts that this is merely a case of discrimination in rates, not involving an overcharge, and that the measure of damges in such instances is not the difference in the two rates but the actual loss, if any, suffered

as a result of the lower rates to others, which damage must be alleged and proved as in the case of all other torts. In passing on this question we must first determine the exact nature of respondent's suit.

The respondent did not assert that it paid an unreasonable rate or that the lower rate extended to certain other customers had been duly established by the utility company or any rate-making body as the rates applicable to its business. Its claim was not that it had paid more than was due under an established rate, but simply that others paid less, and that this mere inequality in rates subjected it to a discrimination in violation of article 1438, V.A.C.S. It was alleged that during part of the time respondent was paying the 19-18-17c rate above mentioned, such customers in Houston as Public Laundries, Ineeda Laundry, Port City Packing Company, Fehr Baking Company and St. Joseph's Infirmary, in the same classification and under similar situations, were furnished gas by petitioner at 14-13-12c for like amounts; and that at other times during such period Oriental Textile Mills, Texas Cresoting Company and the United Cresoting Company were being furnished gas at 16c for the first 1000 cubic feet and 15c for all additional gas. It was not alleged that any of the customers receiving the lower rates were competitors of respondent or that it had suffered any actual loss in its business or otherwise as the result of the action of the utility company in extending lower rates to others. More specifically, it did not allege that it had suffered a loss in an amount equal to the difference between what it had paid under the higher rates and what it should have paid under the lower rates. The petition concludes with the allegation that the giving of the lower rates was a discrimination against it and the prayer is for the difference between the higher and the lower rates.

The jury found that all of the above-named customers of petitioner were consumers under similar and like circumstances as respondent. There were no findings or proof of actual damages or that the rates charged respondent were unreasonable.

There are two utility companies furnishing gas to citizens in Houston and vicinity, one of which is petitioner. At the time of the trial petitioner was serving a total of 83,524 customers. Of this number 76,098 were residential customers, 6048 were commercial customers and 366 were industrial customers. Respondent was of the latter class.

Houston is a home rule city and has the power to fix rates

for all public utilities operating in it. Art. 1175, V. A. C. S. In 1925 the city council fixed $1.05 per 1000 cubic feet as the maximum rate at which all gas might be sold in the City of Houston. By subsequent ordinances the rates for residential and commercial consumers were successively reduced, but no ordinance was ever passed reducing the maximum rate of $1.05 for industrial customers. It left lesser rates for such users to be fixed by the utility company. Article 1435, V. A. C. S., confers upon such utility corporations the right to fix reasonable rates for gas to all customers. The fixing of such rates by utility corporations is limited by article 1438, V.A. C. S., which prohibits discrimination in rates or service "under similar and like circumstances." Any rates fixed by the utility company may be supplanted by rates fixed by the city or the Railroad Commission of Texas as provided by law. Art. 6053, et. seq., V. A. C. S. But neither of such governing bodies ever fixed any rates in Houston for Industrial customers. The Railroad Commission has uniformly refused to fix rates for the sale of gas to industrial consumers anywhere in Texas. An example of such policy and the reason therefor will be found in the Commission's opinion in Re Community Natural Gas Co., 15 Public Utility Reports, N. S., 149, 164, as follows:

"It is not our purpose or intention in this proceeding to fix the purchase price or sale price for industrial gas for the reason that the sale price for industrial gas fluctuates along with the price of other competitive fuels."

All industrial customers of petitioner were served under written-term contracts in which there were embodied the rates which had been established by the utility company for the class of business to which the customer belonged. A total of 64 industrial customers, including all laundries, were served at the 19, 18-17c rate charged respondent. This rate was denominated as the Gulf Coast Rate Division Industrial Service Schedule IS No. 3. In fixing these rates the following factors were considered: (a) load factors; (b) volume consumed on an annual basis; (c) value of service to customer; and (d) competition between gas and other fuels as well as competition between customers for whom the rate is designed.

It was in keeping with these factors that the rate of 16-15c was extended to the Oriental Textile Mills and the two cresoting companies between May 1, 1937, and October 10, 1942. There was no showing that these rates were not those established for the industries to which they were applied nor was there any proof that these rates were applicable to respondent's business.

However, the rates extended these three companies furnished the basis for $3539.41 of the amount of the total recovery against petitioner in the sum of $5094.10.

The remainder of the recovery in the sum of $1554.69 was predicated upon lower rates extended to Public Laundries and certain refunds by reason thereof given to St. Joseph Infirmary, Fehr Baking Company and Port Side Packing Company. The discrepancy arose by virtue of a fuel oil adjustment agreement in written contracts with certain industrial users. The contract of this type with industrial consumers served at the 19-18-17c rate provided that the monthly bills for gas service should be decreased or increased at the rate of one-sixth of one cent per 1000 cubic feet of gas delivered for each one cent per barrel decrease or increase from $1.00 per barrel of Gulf Coast Grade "C" Bunker fuel oil, in cargo lots, plus 20c per barrel for transportation, storage, handling and other miscellaneous expenses incident to the sale of such oil. It further provided that in no event should such decrease or increase exceed 5c per 1000 cubic feet. In the early part of 1933, when the price of fuel oil was very low, the utility company authorized the making of contracts with industrial customers served at the 19-18-17c rate whereby the oil adjustment clause in Rate Schedule IS No. 3 should be waived for a period of one year and that during such time the customer should pay for gas used at the net rate in "Rate Schedule IS No. 3 minus Five (5c) cents per thousand cubic feet for all gas used."

On June 29, 1933, the utility company entered into such a contract with Public Laundries. The main body of the contract contained a stipulation for the 19-18-17c rate designated as Schedule IS No. 3 for a term of two years beginning June 1, 1933, and containing the old fluctuating fuel oil clause. However, by rider attached to and made a part of such contract the fuel oil clause was suspended and a flat reduction of 5c from the IS No. 3 rate was effectuated. This rider stipulated that the waiver should also extend for the two-year period. The respondent and others of the same class who had contracts with the fuel oil adjustment clause received such 5c reduction for one year only. The testimony from the utility company witnesses, which is uncontroverted, was to the effect that the reduction given Public Laundries for two years instead of one was by mistake and, based on the then current prices of fuel oil, was not justified, however, whether such reduction was by mistake or by deliberate design becomes immaterial under our disposition of this cause.

■ The significant thing about the contract with Public Laundries is that the rate schedule attached to it recites that the IS No. 3 rate is the one applicable to any customer contracting to use gas for industrial or other purposes for which no specific schedule is provided, which is the same rate that was charged respondent. This clearly indicates that the IS No. 3 rate was the one applicable to the business of Public Laundries, as well as that of respondent, and that any lower rate was a deviation from the schedule provided for such establishments. This is the important element which distinguishes an overcharge from a discrimination. "Every overcharge, when exacted of one to the exclusion of others, is indeed, a discrimination. Not every discrimination is an overcharge." Postal Telegraph-Cable Co. v. Associated Press, 127 N. E. 256, 259. As will be seen from the authorities hereinafter discussed, a discrimination may arise from a mere inequality in rates but an overcharge arises only where the rate charged is unreasonable in and of itself, irrespective of the rate exacted of others, or when it is in excess of the rate established for the particular customer or business. In a suit for overcharges the rate paid by others is immaterial. It is only in suits for damages for discrimination that rates charged others are important. It is therefore evident that respondent's suit is not for overcharge but for discrimination where, as will hereinafter more fully appear, competition between rate payers is a factor and damages must be alleged and proved. However, respondent seems to ignore these fundamentals and bases its suit solely upon the theory that it should be entitled to recover simply because it paid a certain rate and others paid less.

Before discussing the authorities governing this case we deem it advisable to review briefly the history of the development of law relating to inequalities in rates and the measure of damages for discrimination in charges.

Judge Story makes this statement of the common law rule on this subject in Story on Bailments (8th Ed. 1870) Sec. 508a, as follows:

"But at common law a common carrier of goods is not under any obligation to treat all customers equally. He is bound to accept and carry for all, upon being paid a reasonable compensation. But the fact that he charges less for one than for another is only evidence to show that a particular charge is unreasonable; nothing more. There is nothing in the common law to hinder a carrier from carrying for favored individuals at an unreasonably low rate, or even gratis."

A similar announcement of the rule was made by the English House of Lords in The Directors, etc., Great Western Ry. v. Wm. Richard Sutton, L. R. 4 H. L. 226, 237, decided in 1869, to this effect:

"At common law a person holding himself out as a common carrier of goods was not under any obligation to treat all customers equally. The obligation which the common law imposed upon him was to accept and carry all goods delivered to him for carriage according to his profession (unless he had some reasonable excuse for not doing so) on being paid a *reasonable* compensation for so doing; and if the carrier refused to accept such goods, an action lay against him for so refusing; and if the customer, in order to induce the carrier to perform his duty, paid, under protest, a larger sum than was reasonable, he might recover back the surplus beyond what the carrier was entitled to receive, in an action for money had and received as being money extorted from him.

"But the fact that the carrier charged others less, though it was evidence to show that the charge was unreasonable, was no more than evidence tending that way. There was nothing in the common law to hinder a carrier from carrying for favoured individuals at an unreasonably low rate, or even gratis. All that the law required was, that he should not charge any more than was reasonable."

The latter statement of the common law rule was expressly approved by the Supreme Court of Texas in Railroad Commission v. Weld & Neville, 96 Texas 394, 405-406, 73 S. W. 529, 532.

Other cases which state and discuss the English rule are as follows: Baxendale v. The Eastern Counties Ry. Co., 27 L. J. C. P. 137, 140 Eng. Rep. 1004 (1858); Fitchburg R. Co. v. Gage, 12 Gray 393 (Mass. 1859); Hungerford Market Co. v. City Steamboat Co., 30 L. J. Q. B. 25, 121 Eng. Rep. 479 (1860); Garton v. Bristol & Exeter Ry. Co., 30 L. J. Q. B. 318, 121 Eng. Rep. 656 (1861); Branley v. South Eastern Ry. Co. 31 L. J. C. P. 286, 142 Eng. Rep. 1066 (1862); Johnson v. Pensacola & Perdido R. R. Co., 16 Fla. 623 (1878); Ex parte Benson & Co., 18 S. C. 38 (1882); Cowden v. Pacific Coast S. S. Co., 29 Pac. 873 (Cal. 1892).

The courts of the United States in undertaking to apply the old English common law rule developed an exception thereto. This exception required equality in rates between competitors

in business, whereas, as above shown, the common law rule did not require equality at all, but only that no person should be charged more than a reasonable rate. The American exception requires equality where the favored and disfavored parties are competitors in business and allows a recovery for actual loss or damage, if any, that may be alleged and approved by the disfavored competitor. In each of the cases developing the American rule the court had before it a complaint as to inequality of rates as between competiting shippers or customers. The giving of preferential rates thus gave the favored party an advantage in trade, enabling him to undersell others or to increase his profits and thus ultimately destroy competition and create a monopoly in his particular field.

Our text writers have recognized the American exception to the English common law rule.

In 4 R. C. L. 566, Sec. 35, it is said:

"* * It may safely be said that the tendency and weight of authority are in favor of the doctrine that a common carrier is charged with the quasi-public duty of transporting on equal terms for all persons, where the carrying for some at a lower price than for others would injure those less favored. It is therefore not permissible for a common carrier to demand a different hire from different persons for an identical kind of service under identical conditions."

In Moore on Carriers (First Ed. 1906) 122, Sec. 16, it is also stated:

"Independently of the statutes it is unlawful to discriminate in favor of or against any shipper. A majority of the recent cases hold that at common law a carrier cannot justly discriminate in rates between persons in the same circumstances. But the rule does not require that every shipper shall be charged exactly the same rates or allowed the same facilities; it requires that the carrier shall not unreasonably or unjustly discriminate in favor of or against any shipper where the circumstances and conditions are the same."

From 2 Hutchinson on Carriers (Third Ed.) 570 Sec. 521, we quote:

"Mere inequality in charges does not, therefore of itself amount to an unjust discrimination. It only becomes such when a discrimination is made in the rates charged for transportation

of the goods of the same class of different shippers under like circumstances and conditions.

"So a mere reduction from the established rate is not necessarily an unjust discrimination. But it becomes such when it is either intended or has a natural tendency to injure another shipper in his business and destroy his trade by giving to the favored shipper a practical monopoly of the business."

There are many cases showing the development of the American rule requiring competition between the parties before damages may be recovered for discrimination, among which are the following: Vincent v. C. & A. R. R. Co., 49 Ill. 33 (1868) ; Messenger v. Pennsylvania R. R. Co., 37 N. J. Law (VII. Vroom), 531 (1874) ; John Hays & Co. v. Pennsylvania Co., 12 Fed. 309 (C.C.N.D., Ohio 1882) ; Scofield v. Lake Shore & M. S. Ry. Co., 3 N. E. 907 (1885) ; Indianapolis D. & S. R. Co. v. Erwin, 8 N. E. 862 (Ill. 1886) Menacho v. Ward, 27 Fed. 529 (1886) ; Bayless v. Kansas Pac. Ry. Co., 13 Colo. 181, 22 Pac. 341 (1889) ; Root v. Long Island R. Co., 114 N. Y. 300, 21 N. E. 403 (1889) ; Cook v. Chicago, R. I. & P. Ry. Co., 81 Iowa 551, 46 N. W. 1080 (1890).

With the advent of railroads the common law rules was further modified by statutes both in England and in the United States. Such statutes are of two distinct types. One is exemplified by the English Railway Consolation Act of 1845, and the other by the United States Interstate Commerce Act of 1887. 49 U. S. C. A., Secs. 2 and 8. The English Act, which has influenced legislation in a few jurisdictions in this country, did not require carriers to establish or publish schedules of rates but provided that tolls should be at all times charged equally to all persons for all goods of the same description conveyed over the same railway under the same circumstances. As construed by the English courts this act not only prohibited discrimination but made the lowest charge the legal rate. "Anything in excess of such lowest rate was extortion and might be recovered in an action at law as for an overcharge." Pensylvania R. R. Co. v. International Coal Co., 230 U. S. 184, 202; The Denaby Main Colliery Co., Limited, v. Manchester, L. R. 11 App. Cases 97, 116. The Interstate Commerce Act requires carriers to establish and publish schedules of rates, and prohibits discrimination, but it has never been construed as providing that the lowest charge should be the legal rate. Prior to the passage of the Texas statute (Art. 1438) the former act had been interpreted by the Supreme Court of the United State as limiting the plaintiff's recovery in discrimination cases to actual loss, and that "before any party can recover under the act he must show, not merely

the wrong of the carrier, but that the wrong has in fact operated to his injury." Parsons v. Chicago & Northwestern Ry. Co., 167 U. S. 447, 460. This same interpretation had also theretofore been given the Interstate Commerce Act by the Galveston Court of Civil Appeals in an opinion by Justice Williams in Missouri, K. & T. R. Co. v. Trinity County Lumber Co., 21 S. W. 290, 291, writ denied, wherein it is said:

"* * The same law also prohibits unjust discriminations and the making of unreasonable charges, and appellee contends that the difference between rates allowed carriers and those charged against other shippers constituted an unjust discrimination, which would preclude the recovery of the higher rate. But the law does not provide that an unjust discrimination shall have the effect of limiting the carrier to the lowest rate charged."

In analyzing the decisions involving discrimination in rates which are based upon statutory enactments the distinction in the statutes involved should be kept clearly in mind. For example, respondent relies very strongly upon the case of Union Pacific Co. v. Goodridge, 149 U. S. 680, which decision is based upon a statute of the State of Colorado. That statute not only prohibited the carrier from charging one person or corporation a greater sum than it charged any other for a like service, but also provided that "all concessions of rates, drawbacks and contracts for special rates shall be open to, and allowed all persons, companies and corporations alike." It further provided that any railroad corporation which was guilty of violating the provisions of the statute should forfeit to the injured party three times the actual damage sustained or overcharges paid by the party aggrieved. In the Goodridge case the Supreme Court of the United States determined that the statute made the lowest charge the lawful rate and required that when a lower rate was extended one customer it should be immediately extended to all others in like conditions and similar circumstances. The State of Pennsylvania has had a similar statute which has been similarly construed. Hall v. Pennsylvania Co., 100 Atl. 1035. Such statutes as these are patterned after the English Act of 1845 and have by their peculiar language fixed the measure of damages as indicated. Such an act is not here involved and the Goodridge case is therefore not controlling.

■ Article 1438 is as follows:

"It shall be unlawful for any such corporation to discriminate against any person, corporation, firm, association or place, in the charge for such gas, electric current or power, or in the service rendered under similar and like circumstances."

It will be noted that there is nothing in this article providing a penalty or fixing a measure of damages for discrimination. It is patterned more nearly after the Interstate Commerce Act and must be similarly construed. Like the Interstate Commerce Act it contains no language which may reasonably be interpreted as arbitrarily making the lowest rate the legal rate. It merely declares discrimination to be unlawful and leaves the injured party to the same remedy for damage as existed under our interpretation of the common law. Thus, before one may recover for mere discrimination he must allege and prove his loss as in tort. Notwithstanding this fact, the two courts below have allowed a recovery under article 1438 for discrimination without either allegation or proof of actual loss. Such courts have erroneously interpreted the statute as though it contained language to the effect that when a corporation violates its provisions such corporation shall be liable to the party discriminated against the difference between the rates charged him and the lowest rates accorded the favored party. In other words, the same principles which govern damages for an overcharge have been applied herein in a case involving merely discrimination. This, we think, was error.

■ In the opinion of Justice Cardoza in Interstate Commerce Commission v. United States, 289 U. S. 385, 389, 390, 77 L. Ed. 1273, 1276, is an exhaustive consideration of the question with which we are now dealing. He very ably distinguishes between discrimination and overcharge. In such opinion he says:

"The Commission does not find, and the complainant does not assert, that the rate was unreasonable in the sense that it would be subject to condemnation if a like rate had been charged to others similarly situated. What is unlawful in the action of the carriers inheres in its discriminatory quality, and not in anything else. When discrimination and that alone is the gist of the offense, the difference between one rate and another is not the measure of the damages suffered by the shipper. Pennsylvania R. Co. v. International Coal Min. Co. 230 U. S. 184, 57 L. ed. 1446, 33 S. Ct. 893, Ann. Cas. 1915A, 315; Mitchell Coal & Coke Co. v. Pennsylvania R. Co. 230 U. S. 247, 258, 57 L. ed. 1472, 1476, 33 S. Ct. 916; Southern P. Co. v. Darnell-Taenzer Lumber Co. 245 U. S. 531, 534, 62 L. ed. 451, 455, 38 S. Ct. 186, P. U. R. 1918B, 598; Keogh v. Chicago & N. W. R. Co. 260 U. S. 156, 165, 67 L. ed. 183, 188, 43 S. Ct. 47. Cf. Postal Teleg. Cable Co. v. Associated Press, 228 N. Y. 370, 379, 380, 127 N. E. 256, P. U. R. 1920E, 1. It is an evidentiary circumstance to be viewed along with others in the setting of the occasion. It is not the measure without more. * *

"Overcharge and discrimination have very different consequences, and must be kept distinct in thought. When the rate exacted of a shipper is excessive or unreasonable in and of itself, irrespective of the rate exacted of competitors, there may be recovery of the overcharge without other evidence of loss. 'The carrier ought not to be allowed to retain his illegal profit and the only one who can take it from him is the one that alone was in relation with him, and from whom the carrier took the sum.' Southern P. Co. v. Darnell-Taenzer Lumber Co. supra (245 U. S. 534, 62 L. ed. 455, 38 S. Ct. 186, P. U. R. 1918B, 598). But a different measure of recovery is aplicable 'where a party that has paid only the reasonable rate sued upon a discrimination because some other has paid less." Southern P. Co. v. Darnell-Taenzer Lumber Co. supra. Such a one is not to recover as of course a payment reasonable in amount for a service given and accepted. He is to recover the damages that he has suffered, which may be more than the preference or less (Pennsylvania R. Co. v. International Coal Min. Co. supra (230 U. S. 206, 207, 57 L. ed. 1455, 33 S. Ct. 893, Ann. Cas. 1915A, 315), but which, whether more or less, is something to be proved and not presumed. Id. p. 204. 'Recovery cannot be had unless it is shown that, as a result of defendant's acts, damages in some amount susceptible of expression in figures resulted.' Keogh v. Chicago & N. W. R. Co. supra (260 U. S. 165, 67 L ed. 189, 43 S. Ct. 473. The question is not how much better off the complaint would be today if it had paid a lower rate. The question is how much worse off it is because others have paid less.

In a somewhat earlier opinion of the Supreme Court of the United States in Pennsylvania R. R. Co. v. International Coal Co., 230 U. S. 184, 197, 202 206, 57 L. ed. 1446, 1451, 1453, 1455, Justice Lamar discusses and defines the correct measure of damages in a case of this sort, as follows:

"But although this suit was brought to enforce a cause of action given by this section to any person injured, it is a noticeable fact that in this pleading the plaintiff does not claim to have been damaged and there is neither allegation nor proof that it suffered any injury. It contends, however, that this was not necessary for the reason that, as matter of law, it was entitled to recover as damages the same rate per ton on all plaintiff's shipments as had been rebated any other person, on any of his tonnage, shipped at the same time over the same route.

\*    \*    \*

"Having paid only the lawful rate plaintiff was not over-

charged, though the favored shipper was illegally undercharged. For that violation of law, the carrier was subject to the payment of a fine to the Government and, in addition, was liable for all damages it thereby occasioned, the plaintiff or any other shipper. But under sec. 8, it was only liable for damages. Making an illegal undercharge to one shipper did not license the carrier to make a similar undercharge to other shippers, and if having paid a rebate of 25 cents a ton to one customer, the carrier in order to escape this suit had made a similar undercharge or rebate to the plaintiff, it would have been criminally liable, even though it may have been done in order to equalize the two companies. For, under the statute, it was not liable to the plaintiff for the amount of the rebate paid on contract coal, but only for the damages such illegal payment caused the plaintiff. The measure of damages was the pecuniary loss inflicted on the plaintiff as the result of the rebate paid. Those damages might be the same as the rebate, or less than the rebate, or many times greater than the rebate; but unless they were proved they could not be recovered.

\* \* \*

"To adopt such a rule and arbitrarily measure damages by rebates would create a legalized, but endless, chain of departures from the tariff; would extend the effect of the original crime, would destroy the equality and certainty of rates, and, contrary to the statute, would make the carrier liable for damages beyond those inflicted and to persons not injured."

The cases of Texas Power & Light Co. v. Hilltop Baking Co., 78 S. W. (2d) 718, and Texas Power & Light Co. v. Doering Hotel Co., 162 S. W. (2d) 938, are cited by respondent as authority for the recovery herein but they are not controlling of this case. From the opinion in the Hilltop case it appears that the plaintiff therein was entitled to the rate extended to others, not because it had been extended as a discriminatory favor to others, but because it was the rate applicable to plaintiff's business. Such facts amount to more than mere discrimination. They constitute an overcharge where the measure of damages may be the amount of the overcharge. In the Doering case the measure of damages was not questioned or presented to this court in the application for the writ of error. All points considered in that case related to questions of whether there had been any discrimination and to certain procedural matters alleged to be error in determining the issue of discrimination. The measure of damages was not in issue in this court.

However, the exact question now before us was decided adversely to respondent by this court in Kousal v. Texas Power & Light Co., 179 S. W. (2d) 283. In that case, as in this, there was an undercharge, rather than an overcharge, from the established rate. The Kousals, who were the disfavored parties, sued for the difference in the rates charged them and the lowest rates charged other customers. It was there held that to approve such an arbitrary measure of damages "would create a legalized, but endless chain of departures" from the fixed rate. It was further said:

"Therefore, we are constrained to hold that, although the case made by the Kousals does show unlawful discrimination and preference by the utility of other similarly situated customers, it does not show that the Kousals were charged more than the rate approved and agreed to by the duly constituted governmental agency, hence that they failed to establish a cause of action for overcharge."

It is true the rate paid in the Kousal case was fixed by a governmental rate-making body but we think this fact is immaterial. The measure of damages in a suit for discrimination is the same whether the rate was made by a governmental rate-making body or by the utility itself. Both such rates are authorized by law and whether they are made by one agency or another is not important. Both rates are public rates in the sense that they originate under and by virtue of public authority from the same source—the Legislature. A deviation from a rate established by either agency would provoke the same mischief and result in the same loss. In no case cited by the parties, nor in any we have found, has any distinction been made in the measure of damages for discrimination because of the source of the rate applied. Many of the cases dealing with this question are based upon rates fixed by the defendant. In fact, four of the cases cited in the Kousal case were cases where the rates involved were established by the utility companies indiscriminately. Cock v. Marshall Gas Co., 226 S. W. 464; Seaberg v. Raton Public Service Co., 43 New Mexico, 161, 87 P. (2d) 676; Boerth v. Detroit City Gas Co., 152 Mich. 654, 116 N. W. 628, 18 L. R. A., N. S., 1197; Postal Telegraph-Cable Co. v. Associated Press, 228 N. Y. 370, 127 N. E. 256. The opinion in the Associated Press case cited was written by Justice Cardoza, the same eminent jurist who wrote that in the Interstate Commerce Commission v. United States. In the former the rate was fixed by contract between the parties, as in this case, while in the latter the rates were initially fixed by the carrier but approved by the Interstate Commerce Commission; yet in each case Justice Car-

doza announced identical rules as to the measure of damages. We can conceive of no good reason why the same principle should not obtain in all cases of discrimination irrespective of the source or author of the rate.

From what has been said it follows that the respondent has failed to allege or prove a cause of action either for overcharge or discrimination. However, since the cause has been tried upon an erroneous theory we think justice will best be subserved by remanding the cause rather than rendering judgment for petitioner.

The judgments of both courts below are reversed and the cause is remanded to the trial court.

Opinion adopted by the Supreme Court July 18, 1945.

Rehearing overruled October 17, 1945.