# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO. 03-15-00728-CV

**Westlake Ethylene Pipeline Corporation, Appellant**

**v.**

**Railroad Commission of Texas and Eastman Chemical Company, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
### NO. D-1-GN-15-001-009, HONORABLE TIM SULAK, JUDGE PRESIDING

## O P I N I O N

Westlake Ethylene Pipeline Corporation (Westlake), a "common carrier" pipeline transporting ethylene in Texas, appeals the district court's final judgment affirming a final order of the Railroad Commission of Texas concluding that Westlake's 2013 tariff is discriminatory and may not be enforced. *See United Gas Corp. v. Shepherd Laundries Co.*, 189 S.W.2d 485, 489 (Tex. 1945) (noting that under common law, common carriers may not unjustly discriminate). For the following reasons, we affirm the judgment of the district court upholding the Commission's final order.

## BACKGROUND[1]

Pursuant to a Commission-issued permit, Westlake owns and operates a pipeline that solely transports liquified ethylene and runs between Mont Belvieu and Longview, Texas. In July

---

[1] The facts in this section are taken from the Commission's unchallenged findings of fact and undisputed facts in the administrative record.

2013, Eastman Chemical Company filed a complaint with the Commission alleging that Westlake's new tariff, published and filed with the Commission in 2013 (the 2013 Tariff), was discriminatory. *See* Tex. Nat. Res. Code § 81.053 ("In the discharge of its duties and the enforcement of its jurisdiction under this title, the commission shall . . . hear and determine complaints."); *State v. Crown Cent. Petrol. Corp.*, 369 S.W.2d 458, 463 (Tex. Civ. App.—Austin 1963, writ ref'd n.r.e.) (noting that Commission has exclusive original jurisdiction to consider complaints of discrimination by common carriers). Specifically, Eastman alleged that the 2013 Tariff's cancellation of two pre-existing services—backhaul[2] and exchange[3]—is discriminatory because it provides an unreasonable preference and advantage in favor of another shipper that is an affiliate of Westlake, Westlake Longview Corporation (Westlake Longview).[4]

Mustang Pipeline Company (Mustang), a subsidiary of Eastman, originally constructed the pipeline in 1996 to provide ethylene to its ethylene-consuming facilities in Longview. In 2002, Eastman constructed the so-called "Williams Connection" at the pipeline's Mont Belvieu terminal, which both provided access to a common, fungible ethylene storage facility[5] in Mont Belvieu

---

[2] A "backhaul" is the physical flow of product such as ethylene through a pipeline in the opposite direction from that usually provided by the pipeline. It is undisputed that the pipeline is capable of bidirectional flow.

[3] An "exchange" is a transaction whereby custody of a specific quantity or volume of a fungible product such as ethylene is transferred from one location (e.g., the pipeline's Longview end) to another (e.g., the pipeline's Mont Belvieu end) so that no physical movement of the product is necessary.

[4] Westlake Chemical Corporation is the parent company of both Westlake and Westlake Longview.

[5] Ethylene in the Mont Belvieu market is "fungible" because ethylene molecules are mixed together in common storage facilities, and the ethylene can then be traded or sold to multiple parties

2

owned by the Williams Company and added the compression equipment in Longview necessary to ship ethylene south to Mont Belvieu. At the time of the construction of the Williams Connection, Eastman sought the ability to sell its surplus ethylene produced in Longview and to maintain ethylene production when ethylene-consuming facilities in Longview were down for maintenance. The configurations that Eastman made to the pipeline in 2002 allowed for the pipeline to accept bidirectional flow, and backhaul service remains physically possible on the pipeline.

After adding the compression necessary to deliver ethylene south from Longview to Mont Belvieu, Mustang issued a revised tariff (the 2002 Mustang Tariff). Unlike the previous tariff, the 2002 Mustang Tariff identified Mont Belvieu and Longview as both origin and delivery points. The 2002 Mustang Tariff also indicated that Mustang, the operator of the pipeline, would offer exchange services.[6] Ethylene has been transported in the southerly direction (backhauled) from Longview to Mont Belvieu on several occasions in the following years: 2005, 2006, 2007, 2008, and 2013.

_____

who pull specified amounts of ethylene out of the storage facilities without taking the exact same molecules that were put in by the seller.

[6] With respect to exchanges and direction of flow, the 2002 Mustang Tariff provided:

In the event the pipeline is configured and equipped so that it is physically capable of bi-directional flow, Carrier at its sole discretion will choose the direction of flow between Point of Origin and Point of Delivery. Carrier will make a reasonable attempt to accommodate Shippers through the exchange of product at Origin and Delivery Points. Any exchanges will be subject to the same terms and conditions applicable to shipments pursuant to this tariff, including the rate charged for such shipments. The provisions of this tariff apply to all shipments or exchanges regardless of the direction of flow or whether the product shipped or received is physically moved from one point to another.

3

In 2006, Eastman and Westlake Chemical Corporation (Westlake Chemical) negotiated a transaction in which (1) the Mustang pipeline assets (including the pipeline conduit) were sold to Westlake, (2) certain ethylene-consuming facilities located in Longview and owned by Eastman were sold to Westlake Longview, and (3) Eastman and Westlake Chemical entered into the so-called "Ethylene Sales and Exchanges Contract" (ESA). Although the ESA was not submitted into the record, the Commission found that under it Eastman "secured a guaranteed market for ethylene" and Westlake Longview "secured an ethylene supplier." The Commission found that the ESA also "provided Eastman with the ability to exchange [with Westlake Longview] any excess ethylene that Westlake Longview did not purchase from Eastman."

Shortly before Westlake issued its new 2013 Tariff, Westlake's "commercial team" became aware of the 2002 Mustang Tariff for the first time when it accessed Eastman's confidential data room as part of Eastman's efforts to sell some of its ethylene-producing facilities (referred to in the record as "crackers"[7]). According to Westlake's witness Amy Moore, its commercial team reviewed the 2002 Mustang Tariff and "decided it was time that [the tariff] needed to be updated . . . because it was 11 years old and did not reflect the services actually offered." If the 2002 Mustang Tariff were to remain in place, the pipeline would continue to offer backhaul and exchange services to Eastman (and to any other shippers, including a potential purchaser of the ethylene-

---

[7] The term "cracker" refers to a facility in which natural gas liquids (NGLs, such as ethane and propane, and referred to generically as "feedstocks") are heated to over a thousand degrees to "crack" the feedstock molecules so that they can be separated into the feedstock's various constituents, one of which is ethylene.

producing facilities that Eastman was seeking to sell); under the 2013 Tariff, the backhaul and exchange services would no longer be available.[8]

The Commission found that "Mont Belvieu is the largest market for ethylene producers in the United States" and that "[i]t is reasonable to conclude that the ethylene producers in Longview would require access to the ethylene market in Mont Belvieu." It also found that "Eastman and Westlake Longview each require movement of ethylene between Mont Belvieu and Longview [and] access to the ethylene market[s]" in both cities and that "[t]he only difference is that Eastman requires deliveries from Longview to Mont Belvieu and Westlake Longview requires deliveries from Mont Belvieu to Longview."

Based on its findings, the Commission concluded that Westlake's termination of its pre-existing backhaul and exchange services "provided an unreasonable preference and advantage to its affiliate, Westlake Longview" and that such action was discriminatory because it "cut off access to a market so that all other shippers on the pipeline are forced to sell or exchange their product with a shipper on that same pipeline which is affiliated with the pipeline."

---

[8] Specifically, the 2013 Tariff made the following relevant changes: (1) it specified Mont Belvieu as an "Origin Point" only (while the 2002 Tariff had specified the city as an "Origin/ Delivery Point"); (2) it specified Longview as a "Delivery Point" only (while the 2002 Tariff had specified the city as an "Origin/Delivery Point"); and (3) it eliminated the following provision in the section entitled "Direction of Flow":

> Carrier will make a reasonable attempt to accommodate Shippers through the exchange of product at Origin and Delivery Points. Any exchanges will be subject to the same terms and conditions applicable to shipments pursuant to this tariff, including the rate charged for such shipments. The provisions of this tariff apply to all shipments or exchanges regardless of the direction of flow or whether the product shipped or received is physically moved from one point to another.

5

The Commission's final order rejected Westlake's 2013 Tariff, concluded that the tariff may not be enforced, and ordered that Westlake publish and file with the Commission a "revised tariff that is not discriminatory and conforms to the tariff attached to this Final Order as Exhibit A." In several issues, Westlake contends that the Commission (1) made legal errors in concluding that the Pipeline had discriminated against Eastman (issues one and two), (2) did not have the statutory authority to issue its order (issues three and four), and (3) acted arbitrarily and capriciously in deciding Eastman's discrimination complaint (issue five).

**DISCUSSION**

Final orders of the Commission are "deemed to be prima facie valid and [are] subject to review under the substantial evidence rule." *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co., Ltd.*, 36 S.W.3d 597, 602 (Tex. App.—Austin 2000, pet. denied) (quoting *Imperial Am. Res. Fund, Inc. v. Railroad Comm'n*, 557 S.W.2d 280, 284 (Tex. 1997)). We review the Commission's legal conclusions for errors of law and its findings of fact for support by substantial evidence. *Id.* We are not asked to determine whether the agency reached the correct conclusion, but whether some reasonable basis exists in the record for the agency's action. *Cities of Corpus Christi v. Public Util. Comm'n*, 188 S.W.3d 681, 695 (Tex. App.—Austin 2005, pet. denied). Even if the evidence preponderates against the Commission's finding, that finding may be upheld as long as there is enough evidence to suggest that the Commission's determination was within the bounds of reasonableness. *Id.* We will sustain the Commission's order if the evidence is such that reasonable minds could have reached the conclusion that the Commission must have reached in order to justify its action. *Texas Health Facilities Comm'n v. Charter Med.-Dall., Inc.*, 665 S.W.2d 446, 453 (Tex. 1984).

6

*Common carriers under Texas anti-discrimination law*

Under both the common law and by statute, common carriers in Texas are prohibited from discriminating in providing their services. *See* Tex. Nat. Res. Code § 111.015 ("A common carrier shall receive and transport crude petroleum delivered to it for transportation and perform its other related duties without discrimination."); *United Gas Corp.*, 189 S.W.2d at 489; *see also Webster's Third New Int'l Dictionary* (2002) 648 (defining "discrimination" as "the act or practice on the part of a common carrier of discriminating (as in the imposition of tariffs) between persons, localities, or commodities in respect to substantially the same service").

In its first two conclusions of law, the Commission concludes that Westlake (1) is a "common carrier" as that term is defined under section 111.020(d) of the Natural Resources Code and (2) is, therefore, subject to "all provisions of the Common Carrier Act [chapter 111 of the Natural Resources Code]." *See* Tex. Nat. Res. Code § 111.020(d) ("A person may acquire the right [to lay, maintain, and operate pipelines along, across, or under a public stream or highway in this state] conferred in this section by filing with the commission a written acceptance of the provisions of this chapter expressly agreeing that, in consideration of the rights acquired, it becomes a common carrier subject to the duties and obligations conferred or imposed by this chapter."). Westlake contends that it is not a common carrier under section 111.020(d) but that, even if it is, it is not subject to *all* of the provisions of chapter 111, specifically the statutory prohibition against discrimination because it does not transport "crude petroleum."[9] *See id.* § 111.015. Nonetheless, Westlake concedes that

---

[9] In its fifth issue on appeal, Westlake contends that it is not subject to section 111.015's express prohibition against discrimination and that the Commission, accordingly, erred in relying on the section in reaching its conclusions of law. We will address this issue infra.

7

(a) it is a common carrier under the common law; (b) the Commission has jurisdiction over it as an entity "owning or operating [a] pipeline[] in Texas," *see id.* § 81.051(a)(3); and (c) what constitutes discrimination under the common law also constitutes discrimination under the statute (which does not define "discrimination"). Therefore, even if Westlake were not subject to the express statutory prohibition against discrimination, it is prohibited under the common law from discriminating in providing its services, and the Commission has jurisdiction "to hear and determine complaints" against it. *See id.* § 81.053; *Vista Med. Ctr. Hosp. v. Texas Mut. Ins. Co.*, 416 S.W.3d 11, 25 (Tex. App.—Austin 2013, no pet.) ("[A] reviewing court must generally affirm an administrative order if it is correct on any theory of law applicable to the case regardless of whether the agency purported to rely on that legal theory or even relied on an erroneous one."); *United Gas Corp.*, 189 S.W.2d at 489; *see also Burnett v. Riter*, 276 S.W. 347, 349 (Tex. Civ. App.—Beaumont 1925, no writ) ("A common carrier is one who engages in the transportation of persons or things from place to place for hire, and who holds himself out to the public as ready and willing to serve the public, *indifferently*, in the particular line in which he is engaged." (emphasis added)). Therefore, we need only analyze Westlake's appellate issues under the common law.

The common law has interpreted the term "discrimination" broadly to include a carrier's disparate treatment of similarly situated shippers as well as its providing an unreasonable preference to a particular person. *See Oil Field Haulers Ass'n v. Railroad Comm'n*, 381 S.W.2d 183, 194 (Tex. 1964) (tracing history of Texas common-carrier legislation as "studied effort . . . to prevent, through regulation, unfair, discriminatory, or destructive competition between such authorized carriers as would ultimately impair their usefulness" with objectives of "providing transportation services

8

to all segments of business and industry where such services are necessary and of protecting those services against unfair and destructive practices" (quoting *Texas & Pac. Ry. Co. v. Railroad Comm'n*, 138 S.W.2d 927, 931 (Tex. Civ. App.—Austin 1940), *rev'd on other grounds*, 157 S.W.2d 622 (Tex. 1941))); *United Gas Corp.*, 189 S.W.2d at 489 (tracing development of law of common-carrier discrimination and quoting 2 *Hutchinson on Carriers*, 3rd Ed., 570, Sec. 521, for proposition that carrier's action may be discriminatory "when it is either intended or has a natural tendency to injure another shipper in his business and destroy his trade by giving to the favored shipper a practical monopoly of the business"); *Southwest Stone Co. v. Railroad Comm'n*, 184 S.W.2d 691, 695 (Tex. Civ. App.—Austin 1944, writ ref'd w.o.m.) (noting that Commission's duty to prevent unjust discrimination includes requirement of similar treatment of shippers who are similarly situated); *Fort Worth & D.C. Ry. Co. v. Frazier*, 191 S.W. 808, 813 (Tex. Civ. App.—Fort Worth 1916, no writ) (analyzing legal commentaries and concluding that "it is an unjust discrimination, under the common law, for a common carrier 'to make or give any undue or unreasonable preference or advantage to any particular person'"); *see also CenterPoint Energy Entex v. Railroad Comm'n*, 208 S.W.3d 608, 621 (Tex. App.—Austin 2006, pet. dism'd) (noting that regulated utility may not discriminate in providing services); *Amtel Commc'ns, Inc. v. Public Util. Comm'n*, 687 S.W.2d 95, 101–02 (Tex. App.—Austin 1985, no writ) (holding that under statutory and common-law anti-discriminatory principles applying to public utilities, "dividing line" between unlawful and permissible discrimination is "drawn by the rule of reasonableness" that asks whether discrimination is "founded upon a substantial and reasonable ground of distinction between the favored and disfavored classes or individuals").

9

Within these parameters, the determination of "[w]hat constitutes an unjust or unreasonable discrimination as between shippers is ordinarily a question of fact," *Southwest Stone Co.*, 184 S.W.2d at 694, and we will, accordingly, review the Commission's challenged findings and conclusions in the context of the common law's broad prohibition against discrimination and the Commission's discretion to resolve factual disputes and draw reasonable conclusions therefrom, *see Charter Med.-Dall.*, 665 S.W.2d at 452–53 (noting that in conducting "substantial evidence" review, reviewing court may not substitute its judgment for that of agency on factual questions; evidence may actually preponderate against agency decision and nonetheless amount to substantial evidence; and if there is evidence to support either affirmative or negative findings on specific matter, decision of agency must be upheld). Our review asks "whether some reasonable basis exists in the record for the action taken by the agency." *Id.*

***Challenges to the Commission's discrimination findings and conclusions***

In its second issue, Westlake contends that the Commission's conclusion that Westlake discriminated against Eastman for the "sole reason stated in its Order that Westlake cancelled backhaul and exchange services under the 2013 Tariff" was legally erroneous.[10] *See* Tex. Gov't Code § 2001.174(2)(d) (appellate court must reverse and remand agency decision where appellant's substantial rights have been prejudiced because agency's findings, inferences, conclusions, or decisions are affected by error of law). Essentially, Westlake argues that the tariff's elimination of the backhaul and exchange services could not be discriminatory because it treated all

---

[10] In its related first issue, Westlake contends that the Commission's fact finding that Eastman is a similarly situated shipper is "erroneous as a matter of law."

10

shippers "equally" in that henceforth no shipper would be entitled to request those services. However, as we have already discussed, discrimination includes not only disparate treatment of similarly situated shippers but also the granting of an undue or unreasonable preference or advantage to a particular shipper, *e.g.*, *Frazier*, 191 S.W. at 813, and the Commission concluded that the tariff's elimination of the backhaul and exchange provisions did just that by "cut[ting] off access to a market [Mont Belvieu] so that all other shippers on the pipeline are forced to sell or exchange their product with a shipper on that same pipeline which is affiliated with the pipeline."

The Commission made numerous findings of fact[11] in support of its conclusion of law that elimination of the backhaul and exchange provisions—under the particular circumstances of this case—was discriminatory:

- Eastman uses about 600 million pounds of ethylene annually at Longview, leaving about 800 million pounds of ethylene that must either be sold in Longview or transported to, or exchanged at, Mont Belvieu each year.

- Other than Eastman's own use, the only substantial market for ethylene in Longview is Westlake Longview [Westlake's affiliate].

- Mont Belvieu is the largest market for ethylene producers in the United States.

- It is reasonable to conclude that the ethylene producers in Longview would require access to the ethylene market in Mont Belvieu.

- Eastman produces large quantities of ethylene in Longview and has a physical necessity to move ethylene to Mont Belvieu.

- The record in this case does not provide evidence of the impediment to [Westlake's] continued provisions [sic] of backhaul service.

---

[11] Westlake does not contend that any of these findings are not supported by substantial evidence.

11

- Any concern that this [pipeline] operator lacks the compression necessary to provide backhaul service is addressed by the language in the preexisting *2002 Mustang Tariff*, which requires shippers to deliver and receive product at the necessary pressure.

- There is no impediment for a pipeline to provide exchange service and the risks associated with that service may be mitigated by appropriate language in the tariff.

- The *2002 Mustang Tariff* contained language that protected the pipeline operator and is included in the *2013 Westlake Pipeline Tariff*. Additional language may be added to protect the operator as follows: Carrier is not obligated to transport or exchange any volumes of ethylene unless Shipper delivers those volumes to the common stream out of which deliveries are made to Pipeline Customers.

- Due to the unique circumstances of the ethylene market in Longview, without an exchange provision in the applicable pipeline tariff the only alternative for Eastman is to engage in exchanges with Westlake Longview, the pipeline operator's affiliate.

- Eastman and Westlake Longview each require movement of ethylene between Mont Belvieu and Longview.

- The only difference is that Eastman requires deliveries from Longview to Mont Belvieu and Westlake Longview requires deliveries from Mont Belvieu to Longview.

- Westlake Longview will continue to have access to the pipeline and the Mont Belvieu ethylene market.

- Eastman would be shut out of the Mont Belvieu market by the changes in the *2013 Westlake Pipeline Tariff*.

- Westlake [] has offered no reasonable basis for the disparate treatment as regards to physical deliveries on the pipeline.

- Once [exchange] service is eliminated, Eastman must engage in exchanges with Westlake Longview, an affiliate of the pipeline operator.

- The elimination of backhaul and exchanges, pre-existing services offered by the common carriers of this pipeline, provides an unreasonable preference in favor of Westlake Longview.

12

These fact findings, which are supported by substantial evidence in the record and are unchallenged on appeal, demonstrate that there is a reasonable basis for the Commission's determination that the elimination of the backhaul and exchange provisions in the 2013 Tariff was discriminatory by providing an unreasonable preference or advantage to Westlake Longview, Westlake's affiliate. *See Charter-Med. Dall.*, 665 S.W.2d at 452; *Suburban Util. Corp. v. Public Util. Comm'n*, 652 S.W.2d 358, 364 (Tex. 1983) ("The correct substantial evidence rule test is whether the evidence as a whole is such that reasonable minds could have reached the conclusion that the agency must have reached in order to justify its action."). While Westlake frames the effect of the 2013 Tariff[12] as having a disparate *impact* on different shippers rather than constituting disparate *treatment* of them, such distinction is without a difference on this record, which supports the Commission's reasonable conclusion that the proposed tariff would provide an unreasonable or undue preference to Westlake's affiliate if permitted to take effect. The evidence as a whole is such that reasonable minds could have reached the conclusion that the Commission must have reached in order to justify its action. *Suburban Util. Corp.*, 652 S.W.2d at 364. The Commission's discrimination findings and conclusions were not affected by any "error of law," and we accordingly overrule Westlake's second issue.[13]

---

[12] The Commission suspended the 2013 Tariff during the pendency of the regulatory proceedings, and the 2002 Tariff has been in place through the present.

[13] Because we uphold the Commission's conclusion that Westlake discriminated against Eastman by eliminating the backhaul and exchange services in its 2013 Tariff, we need not reach Westlake's first issue contending that the Commission's fact finding that Eastman is a "similarly situated shipper" is legally erroneous.

13

***Challenges to the Commission's statutory authority***

In its third issue, Westlake contends that the Commission "lacks the statutory authority to compel a common carrier to engage in a particular business service, such as hauling product in a particular direction or performing a virtual exchange of a commodity." *See* Tex. Gov't Code § 2001.174(2)(B) (A court reviewing an administrative decision under the "substantial evidence" rule "shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: . . . (B) in excess of the agency's statutory authority."). Central to Westlake's argument on this issue is its framing of the alleged "unauthorized action" taken by the Commission: its "dictat[ing] that an ethylene pipeline engage in business activities it no longer wants to offer." However, the Commission did not dictate that Westlake (or any pipeline) engage in any particular business activities but, rather, that Westlake file a revised tariff that "is not discriminatory" by "provid[ing] an unreasonable preference or advantage to an affiliate at the expense of other shippers" and "cutting off [shippers'] access to a market so that all other shippers on the pipeline are forced to sell or exchange their product with a shipper on that same pipeline which is affiliated with the pipeline."

The Commission has broad jurisdiction over all common-carrier pipelines in Texas, *see* Tex. Nat. Res. Code §§ 111.013 ("A pipeline subject to the provisions of this chapter . . . shall be operated as a common carrier and shall be subject to the jurisdiction of the commission."); 81.051 ("The commission has jurisdiction over all: . . . persons owning or operating pipelines in Texas [and such persons and their pipelines] are subject to the jurisdiction conferred by law on the commission."). As for the Commission's authority to issue the order it did here—specifically,

14

requiring Westlake to reinstate the backhaul and exchange provisions in its tariff as a remedy to the Commission's finding of discrimination—we hold that the Commission has the express statutory authority "[i]n the discharge of its duties and the enforcement of its jurisdiction . . . [to] hear and determine complaints," *id.* § 81.053, which is exactly what it did here when it heard and decided Eastman's discrimination complaint. *See Crown Cent. Petrol. Corp.*, 369 S.W.2d at 463 (noting that Commission has exclusive original jurisdiction to consider complaints of discrimination by common carriers). Common carriers are specifically prohibited from discriminating under the common law, *e.g.*, *Frazier*, 191 S.W. at 811–12, and the Commission has the express statutory authority to consider and decide discrimination complaints.

The Commission's order is narrow and limited to the pipeline and facts in this case; it does not require that any or all pipelines in Texas engage in any particular business services—backhaul, exchange, or otherwise. In fact, the Commission's dispositive legal conclusion said as much: "There is no general duty for a common carrier to provide backhaul and exchange services. Neither is there a general duty to maintain services previously offered by a common carrier." However, based on its fact findings as supported by the evidence, the Commission determined that *under the facts and circumstances of this case*, Westlake's elimination of the two services so that Eastman and other potential Longview shippers were cut off from the Mont Belvieu market except by going through Westlake's affiliate was discriminatory. Resolving Eastman's discrimination complaint in this fact-specific manner was well within the Commission's authority, and we reject Westlake's contentions that it is not subject to the Commission's jurisdiction and that the Commission lacks the authority to issue the order it did here. We accordingly overrule Westlake's third issue.

15

In its related fourth issue, Westlake contends that the Commission's order "improperly interferes in private contractual matters by awarding Eastman functional control over property (the pipeline) it had previously sold," an action for which it "lacks statutory authority" and which is "arbitrary and capricious." *See* Tex. Gov't Code § 2001.174(2)(b), (f) (providing that court must reverse and remand agency's decision when appellant's substantial rights have been prejudiced because administrative findings, inferences, conclusions, or decisions are in excess of agency's statutory authority or are arbitrary or capricious). As we concluded previously with respect to Westlake's third issue, the Commission has not exceeded its statutory authority by resolving the discrimination complaint in the manner in which it did, despite Westlake's attempt to frame the agency's decision as one "interfering in private contractual matters."[14]

As for Westlake's contention that the Commission's order is "arbitrary and capricious" because it "interferes in private contractual matters," we conclude that Westlake has not identified any of the circumstances under which courts have previously found agency orders to be arbitrary and capricious. These include (1) the order not being supported by substantial evidence, (2) the agency denying a litigant's due process so as to prejudice its rights, (3) the agency improperly basing its decision on non-statutory criteria, (4) the agency basing its decision on legally irrelevant factors or not considering legally relevant factors, (5) the agency considering only relevant statutory

---

[14] We also reject Westlake's attempt to minimize the effects of its discrimination by submitting that Eastman may nonetheless continue to obtain exchange services under the ESA and so, therefore, will not be harmed or suffer any "stranding" of its ethylene in Longview by virtue of the 2013 Tariff's modifications. A common carrier's obligations simply cannot turn on whether an unfairly disadvantaged shipper has an alternative through a third-party contract, which is beyond the reach of regulatory power. *See Railroad Comm'n v. Permian Basin Pipeline Co.*, 302 S.W.2d 238, 253–54 (Tex. Civ. App.—Austin 1957, writ ref'd n.r.e.) (holding that private contracts do not prevent exercise by Commission of its authority and are invalid to extent that they relieve common carriers of their legal duties).

16

factors but reaching a completely unreasonable result, *see Texas Dep't of Ins. v. State Farm Lloyds*, 260 S.W.3d 233, 245–46 (Tex. App.—Austin 2008, no pet.), and (6) the agency's failure to follow the clear, unambiguous language of its own regulations, *see Reliant Energy, Inc. v. Public Util. Comm'n*, 153 S.W.3d 174, 199 (Tex. App.—Austin 2004, pet. denied). Accordingly, we overrule Westlake's fourth issue.

***Challenges to the applicability of and the Commission's reliance on section 111.015***

In its fifth issue, Westlake argues that the Commission's "stated basis for its decision" (section 111.015) is "arbitrary and capricious as lacking any support in the law" because that section "by its terms does not apply to ethylene pipelines" but only to the transportation of "crude petroleum," and ethylene is not crude petroleum. *See* Tex. Nat. Res. Code § 111.015 ("A common carrier shall receive and transport crude petroleum delivered to it for transportation and perform its other related duties without discrimination."); *cf. Vardeman v. Mustang Pipeline Co.*, 51 S.W.3d 308, 313 (Tex. App.—Tyler 2001, pet. denied) ("Ethylene is included in the broad definition of 'crude petroleum.'"). However, even if Westlake were correct that section 111.015 does not apply to it, we must still uphold the Commission's order because we have determined that its decision is correct under the broad common-law definition of common-carrier discrimination, particularly the prohibition against providing an unreasonable preference to an affiliate.[15] *See Charter Med.-Dall.*, 665 S.W.2d at 452–53 ("A reviewing court is not bound by the reasons given by an agency in its

---

[15] Furthermore, section 111.015 requires a common carrier "to receive and transport crude petroleum delivered to it for transportation and *perform its other related duties* without discrimination." Tex. Nat. Res. Code § 111.015 (emphasis added). None of the parties have directly addressed the issue of what a common carrier's "other related duties" might include and whether—assuming that "crude petroleum" does not include ethylene—those duties would include the transport or exchange of other products such as ethylene.

order, provided there is a valid basis for the action taken by the agency."); *Vista Med. Ctr. Hosp.*, 416 S.W.3d at 25 (noting that reviewing court must affirm agency order that is correct on any theory of applicable law, even if agency purported to rely on erroneous theory). Accordingly, we overrule Westlake's fifth issue.

## CONCLUSION

For the foregoing reasons, we affirm the district court's judgment upholding the Commission's final order concluding that Westlake's 2013 tariff is discriminatory and may not be enforced.

_____

David Puryear, Justice

Before Justices Puryear, Pemberton, and Field

Affirmed

Filed: December 7, 2016